**John M. ENGLAND, Trustee in bankruptcy for Sunset Dodge, Plaintiff-Appellant,**

v.

**CHRYSLER CORP. et al., Defendant-Appellee.**

**No. 71-2842.**

United States Court of Appeals,
Ninth Circuit.

Feb. 11, 1974.

Rehearing Denied May 2, 1974.

Michael N. Khourie (argued); Royce H. Schulz, Thomas Paine, Broad, Khourie & Schulz, P. C., San Francisco, Cal., for plaintiff-appellant.

William W. Schwarzer (argued); J. Thomas Rosch, Kenneth Drexler, McCutchen, Doyle, Brown & Enersen, San Francisco, Cal., Keith A. Jenkins, Chrysler Corp., Detroit, Mich., for defendant-appellee.

Before WRIGHT and CHOY, Circuit Judges, and JAMESON,* District Judge.

CHOY, Circuit Judge:

John M. England, trustee for the bankrupt partnership, Sunset Dodge,[1] brought an antitrust action against Chrysler Corporation and two of its wholly-owned corporate subsidiaries— Chrysler Motors, its separate marketing entity, and Van Ness Dodge, a retail

---

* The Honorable William Jameson, United States District Judge for the district of Montana, sitting by designation.

1. Appellant England will hereafter be referred to as Sunset Dodge or Sunset.

dealer located in San Francisco, California. The complaint charged the defendants with conspiring to restrain trade in violation of section 1 of the Sherman Act, 15 U.S.C. § 1 (1970), and discrimination in the provision of promotional allowances in violation of sections 2(d) and (e) of the Robinson-Patman Act, 15 U.S.C. §§ 13(d) and (e) (1970). The Robinson-Patman claims were tried by stipulation to the court which held for Chrysler. The Sherman Act charge was tried before a jury which returned a verdict for Sunset with actual damages totalling $125,000. The district court then granted Chrysler's motions for judgment n. o. v. and, in the alternative, a new trial. Sunset appeals both the Robinson-Patman and Sherman Act rulings. We affirm.

In early 1962, a privately owned Dodge-franchised automobile dealer on Van Ness Avenue, San Francisco's "automobile row," notified Chrysler that it was terminating business. Chrysler considered it essential to have a Dodge dealer in the same location. After a search for a private investor proved unsuccessful, Chrysler established Van Ness Dodge on the location in May, 1962. Van Ness was organized under a Chrysler program whereby it was expected the appointed manager eventually could, largely out of profits, buy out the parent corporation's 100% interest in the dealership.

Chrysler anticipated that Van Ness would initially be a losing operation. Its forecast was correct, for Van Ness' losses were substantial, as had been its predecessor's. These losses were subsidized by Chrysler.

Sunset was a privately-owned partnership formed as a Dodge dealer in September, 1963. Located within two and one half miles of Van Ness, it succeeded another unsuccessful Dodge dealer which had failed on the same site. Shortly after its establishment, Sunset as well encountered financial problems. After incurring large losses, it ceased its short-lived existence in August, 1965.

### Robinson-Patman Act Claims

Chrysler had a program for contributing monies to help defray promotional costs whenever a new dealer opened for business or whenever an established dealer relocated. Pursuant to this program, Chrysler gave Van Ness $24,000 when it commenced business in June, 1962, Sunset Dodge $2,325 when it opened in September, 1963, and Van Ness $10,500 when it relocated in September, 1965. Sunset contends these payments were discriminatory under the Robinson-Patman Act.

■ Sections 2(d) and (e) of the Act prohibit the provision of "anything of value" or the "furnishing [of] any services or facilities," respectively, unless the thing of value, service, or facility is available on "proportionally equal terms" to, respectively, all other competing customers or all other purchasers.[2] As this indicates, the advantaged and disadvantaged parties must be shown to

2. Section 2(d) & (e) of the Robinson-Patman Act, 15 U.S.C. §§ 13(d) & (e) (1970) provide:

(d) It shall be unlawful for any person engaged in commerce to pay or contract for the payment of anything of value to or for the benefit of a customer of such person in the course of such commerce as compensation or in consideration for any services or facilities furnished by or through such customer in connection with the processing, handling, sale, or offering for sale of any products or commodities manufactured, sold, or offered for sale by such person, unless such payment or consideration is available on proportionally equal terms to all other customers competing in the distribution of such products or commodities.

(e) It shall be unlawful for any person to discriminate in favor of one purchaser against another purchaser or purchasers of a commodity bought for resale, with or without processing, by contracting to furnish or furnishing, or by contributing to the furnishing of, any services or facilities connected with the processing, handling, sale, or offering for sale of such commodity so purchased upon terms not accorded to all purchasers on proportionally equal terms.

be competing customers of the giver in order for there to be discrimination under these provisions. *See* FTC v. Simplicity Pattern Co., 360 U.S. 55, 79 S.Ct. 1005, 3 L.Ed.2d 1079 (1959); Tri-Valley Packing Ass'n v. FTC, 329 F.2d 694, 708–709 (9th Cir. 1964).

Given this requirement, the promotional allowance to Van Ness in September, 1965 could not discriminate against Sunset since Sunset was then no longer in existence. It would be purposeless to condemn this allowance when it could have no conceivable competitive significance to Sunset.

■■■ The opening advertising outlays pose a somewhat different, but related problem concerning the competing customers requirement. To be subject to the Act, the disadvantaged recipients (or non-recipients) must be customers of the giver "within approximately the same period of time" as the award is made to the favored party. Tri-Valley Packing Ass'n v. FTC, *supra* at 708; *see* Atalanta Trading Corp. v. FTC, 258 F.2d 365, 371–372 (2d Cir. 1958); Valley Plymouth v. Studebaker-Packard Corp., 219 F.Supp. 608, 610 (S.D.Cal. 1963); Viviano Macaroni Corp., 73 F. T.C. 313, 340–41 (1968); F. Rowe, Price Discrimination under the Robinson-Patman Act, § 4.2 at 48–50, §13.10 at 391–92 (1962).[3] A "competing customer" is only one to whom an allowance could be offered at or near the time the allegedly discriminatory "thing of value" is given to the favored party. Where the allowances are awarded at the commencement of business, as in this case,

the requirement means that both enterprises must have begun operations at reasonably contemporaneous times.

This requirement serves the purposes of the Act. It reflects the policy of the Act that a difference in the amount of the allowance should have some potential for injuring competition. Moreover, if disparate awards granted no matter how far apart in time could be subject to condemnation, the initial allowance would set the permanent level for future awards. Hence, the requirement that the favored and disfavored parties by competing customers at approximately the same time avoids pointlessly freezing the level of the allowances. *See* Atalanta Trading Corp. v. FTC, *supra* at 372.

■■ It would stretch the imagination to conclude that Sunset and Van Ness were competing customers within the meaning of this term. Sunset was not established until sixteen months after Van Ness' award. Moreover, the amounts were intended and, as far as the record shows, used for sendoff advertising which could have no more than a minimal persistent effect after the lapse of sixteen months. We, therefore, hold that there was no discrimination between Sunset and Van Ness as to the initial allowances because they were not competing customers at times reasonably contemporaneous with the more beneficial promotional award. *Compare* Hartley & Parker, Inc. v. Florida Beverage Corp., 307 F.2d 916, 921 (5th Cir. 1962) *with* Atalanta Trading Corp. v. FTC, *supra* at 371–372.[4]

---

3. Some of these cases involve § 2(a) of the Act. The contemporaneous requirement also applies under this section. *See* F. Rowe, Price Discrimination under the Robinson-Patman Act, § 4.2 at 48–50 (1962).

4. It is clear that the competing customers requirement is not satisfied where there is a time span of sixteen months between the awards. A close case may pose a more difficult problem. Because the reasonably contemporaneous standard is a vague one, there is a risk that results in such cases may be arbitrary. It may be appropriate, then, to

apply a standard within a standard to rationalize these results. While the competitive effect of disparate allowances is normally irrelevant under §§ 2(d) & (e), *see* FTC v. Simplicity Pattern Co., 360 U.S. 55, 79 S. Ct. 1005, 3 L.Ed.2d 1079 (1959), there may be no other reasonable standard by which to reach intelligible results in these cases. Hence, it may be proper in such cases—for this limited purpose only—to determine if the discrepancy in the allowances has some impact upon the competitive conditions existing between the favored and disfavored parties.

### Sherman Act Claim

■ The theory of Sunset's action is somewhat unusual. It does not contend that Chrysler and its conspirators acted intentionally to put Sunset out of business or to usurp the retail market. Compare Mt. Lebanon Motors, Inc. v. Chrysler Corp., 283 F.Supp. 453 (W.D. Pa. 1968), aff'd on other grounds, 417 F.2d 622 (3rd Cir. 1969). Rather, it argues Chrysler operated Van Ness in a manner reckless of profit so as to create intense pressure on Sunset to compete at a level that could not be profitable. The downward pressure on prices and terms of sale created by this would, it is argued, result in Van Ness and Sunset selling more of Chrysler's cars, thus attaining "market penetration" for Chrysler. The wholesale profits that would thereby be generated would outweigh the losses Chrysler would sustain at the retail level. Chrysler did not manage Van Ness with the specific intent to so "squeeze" Sunset, the argument concludes, but its deliberate overemphasis on wholesale sales, through the unreasonable operation of Van Ness, led inevitably to an impossible competitive situation and the consequent demise of Sunset.

It may well be that the predominant emphasis on market penetration, which results in the deliberately reckless operation of a subsidized retailer and which has the inevitable effect of forcing competing and non-subsidized dealers to function at an unprofitable level, could, if proved, constitute an unreasonable restraint of trade. See Rea v. Ford Motor Co., 355 F.Supp. 842, 863–871 (W.D.Pa. 1972); cf. Industrial Building Materials, Inc. v. Interchemical Corp., 437 F.2d 1336, 1341–1343 (9th Cir. 1970). For purposes of this appeal, that will be assumed. We find, however, that Sunset has not proved, by sufficient evidence,[5] that Chrysler's conduct was culpable under this legal theory.

Under Sunset's theory it is difficult to distinguish healthy from unhealthy competition, and mismanagement of a business from unreasonable, and therefore unlawful management. A business which through agressive sales tactics intensifies competition is not to be lightly condemned. The competition it creates is not necessarily pernicious even if competitors are "harmed" since competition is always hard on the contestants. Indeed, that is its benefit. Nor should extravagant management of a business alone amount to an antitrust violation; otherwise many unsuccessful businesses might be subject to the antitrust laws. The market conditions which prevailed between Van Ness and Sunset could have been the product of healthy competition and the losses incurred by Van Ness the product of unintentional mismanagement. Or they could possibly have been the result of a policy to operate Van Ness without regard to profit in order to impel two-dealer market penetration. Since it is difficult to distinguish the two and since it is only the latter that we assume is condemnable, Sunset should be required to prove the conduct was deliberate to sustain its case.

To be deliberate does not mean there must be specific intent to produce the unreasonable economic effect (e. g., to "squeeze" Sunset). It means that there must be evidence from which it may at least be inferred that the conspirator determined upon the course of conduct, as opposed to the result.

In this context, Chrysler's conduct would be deliberate if it could be inferred that Chrysler determined to manage Van Ness regardless of retail profit. Yet there is no proof this was the case. Sunset did not show that Chrysler was

---

5. We are mindful of the trial judge's duty not to invade the province of the jury. Therefore, we have drawn all inferences favorably to Sunset and have tested the evidence by a standard asking whether reasonable men might find that the facts amounted to a Sherman Act violation. See, e. g., Standard Oil v. Moore, 251 F.2d 188, 198 (9th Cir. 1957), cert. denied, 356 U.S. 975, 78 S.Ct. 1139, 2 L.Ed.2d 1148 (1958).

relatively less concerned with Van Ness' profitability than with its power to produce retail profits. Rather, all the evidence demonstrates that Chrysler wished the dealer to be successful. When, for example, Van Ness' selling practices appeared unwise—the same selling practices, discussed below, which Sunset points to as evidence of predatory conduct—Chrysler consistently attempted to correct them. Indeed, Sunset failed even to prove that it would be profitable for Chrysler to manage Van Ness at a loss because sales to Sunset and Van Ness would produce wholesale profits that would exceed that loss, proof which would support an inference the conduct was deliberate.

■ Despite these critical gaps in proof, it is possible that consistent predatory practices themselves might support the inference that Chrysler deliberately engaged in a policy of market penetration reckless of retail profit. Sunset relies on three practices which, it argues, establish that Van Ness was managed in such a manner.

First, Sunset points to two misdelivered shipments of automobiles as proof Chrysler wished to force cars on Sunset. Sunset had originally ordered the cars, but when the shipments were delayed, orally cancelled them. Nonetheless, they were delivered. While this is perhaps proof that Chrysler overzealously sold cars to Sunset, it is not germane to the supposed violation here: the reckless operation of Van Ness. To say that Chrysler oversold automobiles to Sunset simply is irrelevant to a claim that Van Ness was managed without regard to profit.

Second, Sunset relies on Van Ness' supposedly excessive advertising expenditures as evidence of predatory management. From Sunset's organization in

September, 1963 until April, 1964, each dealer spent an average of approximately $4,500 per month on new car advertising. In May, 1964 Van Ness' advertising expenditures rose substantially, and thereafter, consistently exceeded Sunset's, though after November, 1964 the amounts Van Ness spent moderated somewhat.

As to the pre-May, 1964 expenses, there is evidence that Sunset planned to spend less then it did, but that the Van Ness advertising appearing at the time Sunset opened forced the latter to meet the competition. Sunset did not show, however, that these early Van Ness expenditures were out of line with what Van Ness had spent prior to Sunset's entry into the market, or that they were greater than amounts spent by other San Francisco dealers. There is not much in this, therefore, that buttresses the jury's verdict.

The evidence of excessive advertising, then, consists essentially of the post-April, 1964 expenditures which were, it is true, unusually high. However, this increase did not occur until well after Sunset had entered the market. Moreover, the post-April level was much reduced after November, 1964 so that the period of clear excess was short-lived. It can hardly be said that these few months of profligate promotional spending constitute substantial evidence supporting appellant's theory.

Third, Sunset contends that Van Ness sold automobiles on unreasonably low terms.[6] There is, however, no evidence that Van Ness engaged in these practices until at least the first quarter of 1964. Indeed, it is clear that Sunset, as its early advertisements indicated and as its repossession rate later confirmed, initiated the policy of selling on marginal terms. And Sunset's selling prices were always less than Van Ness'.[7] To be

6. "Low terms" consist of selling cars with low or no down payment, accepting questionable credit risks, accepting side notes for down payments, over-allowances on trade-ins, and the like. Such practices normally return to haunt the dealer because repossessions are later more likely to occur.

7. Van Ness' retail profit per new car sold, the markup indicative of selling price, exceeded Sunset's by $33 in 1963, $38 in 1964, and $43 in 1965.

275

sure, Van Ness began accepting thin deals after a time, but when the repossession rates first revealed this, Chrysler attempted to correct the practices. Even though Van Ness may have been guilty of ill-advised business policies, then, there is no substantial evidence its thin deals were the result of a deliberate and unreasonable emphasis on market penetration.

Our review of the record therefore confirms the trial court's assessment of the evidence. The district court's ruling on the motion for judgment n. o. v. is affirmed.

Affirmed.