CAPITAL TEMPORARIES OF HART-
FORD, INC., et al.

v.

The OLSTEN CORPORATION.

Civ. No. 14749.

United States District Court,
D. Connecticut.

Sept. 30, 1974.

See also, D.C., 365 F.Supp. 888.

Ralph C. Dixon, Philip S. Walker, Robert P. Knickerbocker, Jr., Hartford, Conn., for plaintiffs.

Irving S. Ribicoff, Hartford, Conn., for defendant.

## RULING ON MOTION FOR PARTIAL SUMMARY JUDGMENT

BLUMENFELD, District Judge.

In 1965 Constantine T. Zessos (Zessos) entered into a franchise agreement with the Olsten Corporation (Olsten), which licenses firms to operate under its trademark and to provide temporary employees to businesses throughout the United States and Canada. Under the terms of that agreement Zessos agreed to pay Olsten $6000 plus 5% of his gross billings as a franchise fee[1] and operated his franchises as "Olsten's of Hartford County, Inc." and "Olsten's of New Haven County, Inc."[2] Subsequently substantial disputes arose between the parties, and Zessos began operating as "Capital Temporaries, Inc. of Hartford" and "Capital Temporaries, Inc. of New Haven."[3] On November 10, 1971, Olsten sued Zessos in state court to enforce the 1965 agreement;[4] on November 24, 1971, Zessos entered this action against Olsten; on November 30, 1971, Olsten filed an action in this Court to restrain Zessos from palming off the services of Capital Temporaries as being those of Olsten. This latter action produced a temporary restraining order against Zessos. Olsten Corp. v. Zessos, Civ. No. 14,760 (D.Conn.1971).[5]

The amended complaint in the present action alleged six counts, based on Olsten's alleged violations of the terms of the contract, breach of fiduciary duty, unfair competition and deceptive trade practices, abuse of process, imposition of an illegal tie-in, and other violations of the antitrust laws. The defendant counterclaimed on a series of notes allegedly binding Zessos' companies to pay Olsten $12,253.65. This Court has already ruled on cross-motions for summary judgment on Count Five, which alleged that Olsten violated the antitrust laws by imposing an illegal tie-in on Zessos' companies, viz., that Zessos must operate a blue-collar ("Handy Andy") franchise as well as his white-collar ("Olsten") franchises. The defendant's motion was granted, and Count Five was dismissed. Capital Temporaries, Inc. v. Olsten Corp., 365 F.Supp. 888 (D.Conn.1973). This decision was certified pursuant to 28 U.S.C. § 1292 (1970) for immediate appeal and is presently awaiting decision in the Court of Appeals.[6]

At issue currently is the defendant's motion for summary judgment on

---

1. Agreement of September 17, 1965 (this document is Exhibit A and is attached to the amended complaint) 2–3:

 "3. The LICENSEE [Zessos], upon the signing of this agreement, agrees to pay the sum of $6,000.00 as a charge for the franchise . . . .
 "4. In addition to, and apart from, the license charge, the LICENSEE agrees to pay franchise fees computed at five (5) per cent of gross billings. . . ."

2. In addition, and pursuant to the agreement, Zessos in 1969 incorporated "Handy Andy of New Haven, Inc." to provide blue-collar services.

3. The pleadings in this and related actions also refer to Zessos' companies as "Capital Temporaries of Hartford, Inc." and "Capital Temporaries of New Haven, Inc."

 Handy Andy of New Haven, Inc. ceased operation in December 1970. Affidavit of William Olsten, April 10, 1973, at ¶ 39.

4. *Id.* at ¶ 44.

5. Any further proceedings in that action were stayed with the expectation that it would become moot upon resolution of the state case on the merits. Olsten Corp. v. Zessos, Civ. No. 14,760 (D.Conn.1971), at 1 n. 1.

6. Second Cir. No. 73–8427.

Count Six of the amended complaint. Count Six, after stripped of allegations of illegal tie-ins[7] (in accord with the earlier judgment of this Court), alleges that paragraphs 5 and 14 of the franchise agreement violate § 1 of the Sherman Act,[8] thereby making the agreement "illegal, voidable, and unenforceable."[9] The paragraphs complained of are as follows:

"5. The LICENSEE agrees to cooperate and consult the LICENSOR relative to national accounts and to conform to any special arrangements or rate reductions initiated by the LICENSOR for the benefit of the LICENSEE.

\* \* \* \* \* \*

"14. Rates for services provided by the LICENSEE shall be competitive in the area serviced by the LICENSEE and shall be established after consultation with the LICENSOR."[10]

*Paragraph 14*

Except for the conclusory allegation in the amended complaint that paragraph 14 violates § 1 of the Sherman Act, the plaintiffs have provided nothing that supports or explains the theory of their claim. This conduct would seem to run afoul of Fed.R.Civ.P. 56(e): "When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations . . . of his pleading . . . . If he does . . . summary judgment, if appropriate, shall be entered against him." However, one ground upon which the plaintiffs oppose this motion for summary judgment on Count Six is that both parties interrupted discovery when the motions for summary judgment on Count Five were considered. Discovery will not continue until the Second Circuit hands down its decision on that matter because neither side wishes to incur the cost of further discovery until the relevant issues are ascertained.[11] Thus the plaintiffs in ef-

---

7. Count Six incorporates by reference the allegations of Count Five, dismissed by order of the Court. It also complains of paragraph 2 of the franchise agreement, which deals solely with the alleged Handy Andy tie-in:
"2. The grant of the license hereunder includes the right of the LICENSEE to use the trade mark and name HANDY ANDY LABOR. All 'blue collar' personnel shall be supplied by a division of the LICENSEE designated as HANDY ANDY LABOR commencing six (6) months from the date hereof. . . ." Agreement, *supra* note 1, at 2.

8. 15 U.S.C. § 1 (1970):
"Every contract . . . in restraint of trade or commerce among the several States . . . is declared to be illegal . . . ."
Count Six also alleges that paragraphs 5 and 14 violate § 3 of the Clayton Act, 15 U. S.C. § 14 (1970):
"It shall be unlawful for any person engaged in commerce, in the course of such commerce, to lease or make a sale or contract for sale of goods, wares, merchandise, machinery, supplies, or other commodities, . . . or fix a price charged therefor, . . . where the effect . . . may be to substantially lessen

competition or tend to create a monopoly in any line of commerce."
However, that section applies only to "commodities," whereas here we are concerned with "services." *See* Northern Pac. Ry. v. United States, 356 U.S. 1, 13 n. 1, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958) (Harlan, J., dissenting); Advance Business Sys. & Supply Co. v. SCM Corp., 415 F.2d 55, 64 (4th Cir. 1969); MDC Data Centers, Inc. v. International Business Machines Corp., 342 F.Supp. 502, 504 n. 2 (E.D.Pa.1972); Centanni v. T. Smith & Son, 216 F.Supp. 330, 339 (E.D. La.), aff'd mem., 323 F.2d 363 (5th Cir. 1963).

9. Amended Complaint 10.

10. Agreement, *supra* note 1, at 3, 6.

11. The defendant disputes this allegation:
"We do not understand what plaintiffs refer to when they talk about their postponement of discovery . . . .
"Plaintiffs seem to forget that all of the discovery in this case to date was taken before the Motion for Summary Judgment on the Fifth Count was filed by defendant. . . .
". . . [P]laintiffs have not only had ample opportunity for discovery, but they have already deposed two people, one of whom, Alec R. Faberman, President of de-

fect argue that they have an excuse for not going beyond their pleadings at this point and that the decision on this motion should be postponed until after the Court of Appeals has ruled and discovery has been completed.

■ We cannot, on the facts of this case, agree; summary judgment is eminently appropriate. The only imaginable defect that might be asserted in paragraph 14 is that its command that "[r]ates . . . shall be competitive . . . and shall be established after consultation with the LICENSOR" makes out an offense of price-fixing in violation of § 1 of the Sherman Act. This claim is without merit if based solely on the terms of the agreement; paragraph 14 in essence is a promise that Zessos will *not* engage in price-fixing. There is no allegation or evidence that the course of performance under paragraph 14 was any less innocent than the provision itself. Zessos, in his deposition, indicates that he changed his rates without consultation with Olsten whenever he found it necessary,[12] and the plaintiffs have not controverted Mr. Olsten's affidavit that "[t]he Olsten Corporation has not, at any time, admonished, reprimanded, threatened, coerced or otherwise pejoratively commented upon any rate or rate changes initiated by Mr. Zessos . . . ."[13] In other words there is not even an indication that the plaintiffs, who have already undertaken rather full discovery, wish further discovery as to paragraph 14,[14] much less the slightest reason to believe that there is anything to discover that would aid them in maintaining this claim. Thus partial summary judg-

ment is appropriate as against the plaintiffs' antitrust claims with respect to paragraph 14.[15]

### Paragraph 5

In order to understand the Sherman Act allegations with respect to paragraph 5, it is important to first review the facts surrounding "national account" business. Olsten is a large concern with offices in principal cities in both this country and Canada. Through its franchisees and its own branch offices (which it maintains instead of franchises in some areas) Olsten is thus in a position to furnish temporary employment services to large companies with offices scattered around the nation. In competition with other geographically diverse employment contractors, Olsten tries to take advantage of this positioning by soliciting "national accounts" through its central office. Olsten contends that the competition for this business is fierce,[16] and it is undisputed that the price at which it sells these customers is, at least sometimes, lower than the rates individual franchisees charge their local customers. In order to commit itself to these national accounts (which it considers its own customers), Olsten needs some way of assuring that its franchisees will cooperate with this central sales effort. To this end paragraph 5 was included in Zessos' franchise contract.

On its face paragraph 5 could mean almost anything, and the parties have quarreled bitterly about the import it in fact had. According to Olsten it was entirely benign. Olsten wished to help its franchisees increase their billings

---

fendant, is obviously familiar with all of defendant's operations. The other top officer of the defendant, William Olsten, whom plaintiffs now 'want' . . . was never noticed for deposition." Supplemental Memorandum in Support of Defendant's Motion for Summary Judgment 7.

12. Deposition of Constantine T. Zessos, December 26, 1972, at 134–135.

13. Affidavit of William Olsten, January 28, 1974, at ¶ 18.

14. Plaintiffs' request to delay a ruling until all discovery is completed is addressed to all of Count Six, and the alleged Sherman Act infirmities of paragraph 14 are but a small corner of that whole.

15. *Cf.* Western Geophysical Co. of America v. Bolt Associates, 305 F.Supp. 1251 (D. Conn.1969), appeal dismissed, 440 F.2d 765 (2d Cir. 1971).

16. Affidavit, *supra* note 13, at ¶¶ 25–28.

and knew that they, individually, had no entree into national firms. Thus Olsten undertook to solicit national accounts. In doing so Olsten

> "whenever possible, consults with franchisees for the territories in which the services are to be provided as to the prices for the various categories of temporary personnel that each franchisee wishes to charge in his area of operation and such information is used in the bidding and negotiation process with the national account by Olsten . . . ." [17]

If, however, the rate Olsten decided upon were too low to be profitable for an individual franchisee,[18] the franchisee had the option, without incurring Olsten's displeasure,[19] to refuse to service the account at Olsten's price and to attempt to negotiate a higher rate itself with the local office of the national concern.[20] Under this arrangement, according to an Olsten officer:

> " . . . Even if the Franchisee determines not to service the customer under the 'National Account', the Franchisee has a significant competitive advantage over other temporary personnel services, since
>
> > a) the Franchisee knows that the Defendant has not been able to provide services to the 'National Account' for the geographical area in which the Franchisee does business, under the national agreement;
> > b) the Franchisee further knows, by its having had an opportunity to reject the rates under the Olsten Agreement, what the rates under the 'National Account' were for the Franchisee's business area; and
> > c) the Franchisee knows that the 'National Account' is interested in seeking temporary office personnel in the Franchisee's business area." [21]

Under the plaintiffs' view of the facts, paragraph 5 and the course of performance thereunder had a different purpose and effect.[22] In particular, the plaintiffs deny that they had the option to negotiate their own rates with the local outlets of national concerns if they rejected Olsten's discount proposal; they also deny that Olsten received such refusals with complete equanimity.[23] It

---

17. *Id.* at ¶ 24.

18. Zessos apparently computed rates by adding a mark-up to the rate his companies had to pay their temporaries. Thus, for instance, if Olsten set a rate below the cost of the temporaries to the franchisee, the franchisee would wish to refuse to service the national customer. *Cf.* Deposition, *supra* note 12, at 136–138. *See also* Affidavit, *supra* note 13, at ¶ 34:
> "The decision by the individual franchisee to either participate or not participate in the servicing of such a national account is a business decision made solely by the particular franchisee . . . ."

19. *See id.* at ¶¶ 35–36:
> "35. The Olsten Corporation has never required, nor does it believe that it can require, any particular franchisee to service any particular national account at any particular rate;
> "36. The Olsten Corporation has never terminated or threatened to terminate or otherwise sanctioned or threatened to sanction a franchisee for his or her failure to cooperate or participate in national account promotions or services initiated by The Olsten Corporation . . . ."

20. *See* Affidavit of Max Bergheiser (Olsten vice president, secretary, and treasurer), April 18, 1974, at ¶ 11:
> "Having declined participation in servicing the 'National Account' at the negotiated rate, the Franchisee may negotiate its own rates with the national company within the particular geographical area where he does business . . . ."

21. *Id.* at ¶ 12.

22. *See also* Swettlen v. Wagoner Gas & Oil, Inc., 373 F.Supp. 1022 (W.D.Pa.1974).

23. *See* Deposition, *supra* note 12, at 135–136, 139:
> "Q Okay. Did Olsten, at any time—by Olsten, I mean the Olsten Corporation or anybody connected with it—at any time during the course of this agreement, ever tell you what rates to charge?
> "A On this one national account that I will try to get the name of, they told me I had to charge a certain rate.
> > \* \* \* \* \*
> "Q . . . And on the national account, they had you charge a rate? Was that above or below your then rate in effect for your customers, generally?

appears from the franchise agreement that had Olsten wanted to enforce paragraph 5 it would have been within its power to impose sanctions on Zessos. Paragraph 1 provides in part:

"A It was below.
"Q It was below? Did you accept the account?
"A No.
"Q I see. Did they tell you you had the option not to accept the account?
"A They were very upset that I didn't accept the account, but I couldn't get a person to work for that low rate that I would have to pay them.
"Q So in other words, you simply told them that you couldn't do it for that. Did you tell them you couldn't do it for that money?
"A I told them I couldn't do it for that money.
"Q They were upset? Did they say you had to do it?
"A They said if I was going to do it, I had to do it at that rate.

&ast; &ast; &ast; &ast; &ast;

"Q Incidently, whatever that so-called national account was, did you ever do any business with them thereafter?
"A No, sir."

In an affidavit, Zessos repeats these assertions and adds:

"5. For example, Olsten imposed the schedule set forth in Exhibit A with regard to Union Carbide. Economically it was not feasible to service Union Carbide locally at the prescribed rates.
"6. The success of the plaintiffs' business depends on providing quality service on a reliable basis more than on the rates alone. However, because of the defendant's mandated rates, we were foreclosed from seeking this business on our own on the basis of our superior service and have lost our opportunity to profit thereby."

Affidavit of Constantine T. Zessos, February 28, 1974, at ¶¶ 5–6.

Max Bergheiser of Olsten in his affidavit maintains that the "Exhibit A" to which Zessos refers was not an offer to service a national account of the type heretofore described, but was a "PTP" agreement:

"15. In reality, Exhibit 'A' is an internal Olsten memorandum which refers to a 'Personnel Transfer Plan' ('PTP') Agreement. Under this plan, an Olsten office hires former employees of the customer (in this case, Union Carbide) to work for Olsten at the customer's premises or hires personnel who are recruited, tested, interviewed and screened by the customer to work for Olsten at the customer's premises.

"1. The LICENSOR hereby grants to the LICENSEE the exclusive and non-transferable license to use the trade name and trade mark OLSTEN'S, the various techniques and

"16. The Personnel Transfer Plan is usually used when an Olsten customer choses to no longer carry certain of its employees on its own payroll or where the customer desires to keep them on Olsten's payroll, during a probationary period or during a seasonal job. Such employees are thus 'transferred' to the Olsten branch or Franchisee payroll and paid a net rate the same as the rate previously paid to them by the customer. The Olsten customer pays Olsten or its Franchisee, as the case may be, the cost of the payroll plus a specific percentage mark-up to cover Olsten's or its Franchisee's over-head, including payroll taxes and insurance, and profit.
"17. A 'PTP' plan is a well known type of business arrangement in the temporary personnel services industry which is known to and used by many customers and by many temporary personnel service organizations." Affidavit, *supra* note 20, at ¶¶ 15–17.

In addition Bergheiser disputes Zessos' contention that because he rejected Olsten's price with respect to Union Carbide he was foreclosed from doing business with them:

"18. Olsten's Franchisees may participate in the 'PTP National Account' at the negotiated mark-up rate or decline to do so just as in the case of any other 'National Account' agreement. If the Franchisee chooses to participate, he is paid by the customer at the negotiated rate. If the Franchisee declines participation, he is free to approach the national company on his own to negotiate his own rates with the customer for the area in which the Franchisee does business.
"19. As noted in Paragraph '12' hereinbefore [see text accompanying note 21 *supra*], the Franchisee obtains a competitive advantage, even if he declines the 'PTP National Account'.
"20. Although Mr. Zessos claims to have been foreclosed from Union Carbide because he declined the 'PTP National Account' business, Plaintiff did in fact service Union Carbide for three hundred and forty five (345) hours of services in 1970 and ninety-six (96) hours of services in 1971, periods during which the 'National Account' agreement was in effect with Union Carbide. Plaintiffs were, therefore, in no manner 'foreclosed' from servicing Union Carbide." *Id.* at ¶¶ 18–20.

systems in the area above described *so long as the LICENSEE observes and performs all of the terms, covenants and conditions of this agreement. . . .*" [24]

It also appears that the provisions of paragraph 5 concerned Zessos long before this litigation began.[25]

 Genuine issues clearly exist as to the parties' intent and performance under paragraph 5, and Fed.R.Civ.P. 56(c) authorizes entry of summary judgment only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." However, the defendants would still be entitled to summary judgment if the issues emanating from paragraph 5 were not material in this case. If, in other words, this Court fulfills its obligation to view disputed facts in the light most favorable to the nonmoving party, Adickes v. S. H. Kress & Co., 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); 6 J. Moore, Federal Practice ¶. 56.15[3], at 2337 (2d ed. 1965), and adopts the plaintiffs' interpretation of the facts stemming

from paragraph 5 yet concludes that even under that view no violation of Sherman Act § 1 is made out, paragraph 5 would be immaterial to this case and the defendant's motion for summary judgment would be granted.

One of the plaintiffs' arguments for finding a Sherman Act violation is that they "were not free to compete with the defendant for locally generated business by such 'national accounts' by direct negotiations with such accounts." [26] Additionally they contend that "[e]ven during the course of the franchise agreement between them, the plaintiffs and defendant were competitive. Olsten not only does business through franchisees but also itself has branch offices to provide temporary office personnel." [27] It is hard for the Court to understand exactly what this argument signifies. There are neither facts nor even allegations that Zessos was not free, until Olsten sent him a national account, to try to negotiate his own deal with the account's local office. Nor do the plaintiffs allege that Olsten was in competition with them in the sense that it could sell directly to their customers. Olsten's own branch offices were apparently located in other areas, not where they were competitors of Zessos for Hartford-New Haven business,[28] and Olsten's

---

24. Agreement, *supra* note 1, at 2 (emphasis added). However, failure to observe paragraph 5 was not explicitly made a major breach of the agreement, as was failure to meet some of the other obligations of the contract, e. g., ¶ 15 (obligation to pay salaries and taxes as they came due); ¶ 31 (bankruptcy or insolvency of the franchisee). Paragraph 32 provides that "[a]ny question, dispute or controversy arising out of this agreement shall be determined by arbitration within the State of New York and in accordance with the rules as set forth by the American Arbitration Association." *Id.* at 15.

25. Exhibits 2 and 3 to Olsten's motion for summary judgment on Count Five are admitted to be a letter to Zessos from his attorney and some of Zessos' own notes. On May 6, 1968, John Poulos, the attorney, advised that "[i]n Paragraph 5, you should include language providing for arbitration if

you believe national rates are unreasonable." In Zessos' notes the point is termed "very important . . .: It may be detrimental to my rate structure in relationship to my other accounts. Could ruin me with my other customers. Have to be fair with my other and all customers."

26. Plaintiffs' Memorandum in Opposition to Defendant's Motion for Summary Judgment as to the Sixth Count 5.

27. *Id.* at 6.

28. There is an unexplained amendment to the franchise agreement, dated February 1, 1968, which provides in part:
"1. The LICENSEE does hereby grant the LICENSOR the right to place Technical, Professional and Engineering personnel in the licensed territory on condition that the LICENSEE receive one and one half percent (1½%) of the gross total billing resulting therefrom. . . . The

central office apparently did not have a local labor pool from which it could fill orders. Thus, this is neither a customer reservation case [29] nor a case containing predatory horizontal behavior by a franchisor against its franchisee.[30] Without more help from the plaintiffs than their skimpy briefing of these issues provides, the Court is unable to detect any merit in these claims of Sherman Act violations.

■ Although the above arguments are easily disposed of, the core of the plaintiffs' case—that paragraph 5 constitutes an illegal price-fixing agreement —remains. The plaintiffs do not base their price-fixing charges on an allegation that Olsten forced them to accept national accounts at the price offered,[31] although on its face paragraph 5 is susceptible of the interpretation that Olsten could force such acceptance and although Zessos claims that when he refused to take national accounts Olsten was "very upset." Rather, the crux of their case lies in the alleged "take-it-or-leave-it" character of Olsten's offers which foreclosed them from independent negotiation and ratemaking with respect to these national accounts. A bit of analysis reveals that the plaintiffs are, therefore, complaining that Olsten is imposing a ceiling on the rate that they can charge each national account;[32] the plaintiffs presumably would have wished to negotiate for this business at higher prices. The legal issue is thus framed: can a franchisor, without running afoul of § 1 of the Sherman Act, impose a maximum on the prices that its franchisee can charge?

■ Price-fixing is one of the practices that the Supreme Court has time and again held to be a per se violation of Sherman Act § 1. *See, e. g.,* United States v. McKesson & Robbins, Inc., 351 U.S. 305, 76 S.Ct. 937, 100 L.Ed. 1209 (1956); United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940); United States v. Trenton Potteries Co., 273 U.S. 392, 47 S.Ct. 377, 71 L.Ed. 700 (1927). This rule has been followed whether the price-fixing was imposed vertically or horizontally and, significantly for this case, whether the price fixed was a maximum or a minimum. In Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, 340 U.S. 211, 71 S.Ct. 259, 95 L.Ed. 219 (1951), two related but competing liquor manufacturers were convicted of conspiring to sell only to wholesalers who would abide by a maximum resale price schedule. The Court observed that "such agreements, no less than those to fix minimum prices, cripple the freedom

LICENSEE shall not solicit such employees of the LICENSOR or its designee, nor shall the LICENSEE solicit or supply Technical, Professional and Engineering personnel and/or services to those firms at such times that LICENSEE is receiving said one and one half percent (1½%) of billing."
There is no evidence as to the relevance of this amendment to the dispute at hand. Since the major part of Zessos' business apparently involved secretarial personnel, however, the Court will consider this amendment irrelevant in light of the fact that the plaintiffs nowhere advert to it or base their Sherman Act claims upon it.

29. *See, e. g.,* White Motor Co. v. United States, 372 U.S. 253, 83 S.Ct. 696, 9 L.Ed.2d 738 (1963). It is possible that a manufacturer would reserve certain large customers to himself in order to eliminate competition for their orders among himself and his wholesalers/retailers. Here, however, Olsten cannot sell to national accounts without using the labor pools of its franchisees or branch offices, so the issue is not that of the customer reservation situation—competition between Olsten and Zessos for the profit on a sale to a national account.

30. *See, e. g.,* Rea v. Ford Motor Co., 355 F. Supp. 842, 863–874 (W.D.Pa.1972), rev'd in part, 497 F.2d 577, 587–592 (3d Cir.), petition for cert. filed, 43 U.S.L.W. 3124 (U.S. July 25, 1974) (No. 75–5); *cf.* England v. Chrysler Corp., 493 F.2d 269 (9th Cir.), petition for cert. filed on other grounds, 43 U. S.L.W. 3128 (U.S. July 27, 1974) (No. 74–24).

31. Plaintiffs' Memorandum, *supra* note 26, at 5–6.

32. The plaintiffs obviously have no incentive to independently negotiate a *lower* rate: if they can sell national accounts at Olsten's rates their profits could only be diminished by selling for less.

of traders and thereby restrain their ability to sell in accordance with their own judgment." 340 U.S. at 213, 71 S. Ct. at 260. In Lessig v. Tidewater Oil Co., 327 F.2d 459, 463–464 (9th Cir. 1964) the court held that a jury could find a § 1 violation from evidence that Lessig's service station franchise was revoked when he refused to lower his prices in accord with the franchisor's orders. In Albrecht v. Herald Co., 390 U.S. 145, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968) a newspaper publisher imposing a maximum price at which a route distributor (who had an exclusive territory, as did Zessos in the instant case) could sell its papers was held to have violated § 1. The Court said:

> "We think *Kiefer-Stewart* was correctly decided and we adhere to it. Maximum and minimum price fixing may have different consequences in many situations. But schemes to fix maximum prices, by substituting the perhaps erroneous judgment of a seller for the forces of the competitive market, may severely intrude upon the ability of buyers to compete and survive, in that market. Competition, even in a single product, is not cast in a single mold. Maximum prices may

be fixed too low for the dealer to furnish services essential to the value which goods have for the consumer or to furnish services and conveniences which consumers desire and for which they are willing to pay. Maximum price fixing may channel distribution through a few large or specifically advantaged dealers who otherwise would be subject to significant non-price competition. Moreover, if the actual price charged under a maximum price scheme is nearly always the fixed maximum price, which is increasingly likely as the maximum price approaches the actual costs of the dealer, the scheme tends to acquire all the attributes of an arrangement fixing minimum prices. . . ." [33]

Against the heavy weight of such precedents the defendant offers an attempted distinction: unlike the cases above, there is no "resale" involved here, for the franchisor has no product that it funnels through the franchisee to the public. Instead, Olsten argues, this case involves a direct sale by Olsten to the consumer, with the goods to be supplied by the franchisee.

The defendant's argument is novel, and no cases are cited in support of it.[34]

---

33. 390 U.S. at 152–153, 88 S.Ct. at 873 (footnote omitted). Given the compensation scheme under the franchise contract, *see* note 1 *supra,* it is not hard to imagine another effect of a price ceiling in the present situation. Olsten's franchise fee includes 5% of gross billings, and the franchisee's profit is the rate charged minus 5% minus his cost of doing business. Thus Olsten has less to gain from higher prices (5% of the increase) than the franchisee (95% of the increase). Even without plotting supply and demand curves it is obvious that there may be situations in which Olsten would prefer to increase sales (and receive 5% of the gross) and the franchisee would prefer to raise his prices (and receive 95% of the increase). For instance, because of bargaining costs it may be that Olsten would try to negotiate a flat discounted rate nationwide for one of its national accounts. In those locales where the market would allow a franchisee to charge higher prices (e. g., where there is no competing employment service) it would be unhappy with Olsten's rate. If Olsten allows enough franchisees to ignore the discounted rate, the national ac-

count is likely to leave Olsten entirely. Thus Olsten's interests would be at odds with those of the franchisee, for Olsten would want to enforce the discount and retain the business nationwide, while the franchisee would want to make all the profit the market allows on its own sales to the national account. In such a case a maximum price limit would serve Olsten's interests at the expense of those of the franchisee. *See* England v. Chrysler Corp., 493 F.2d 269 (9th Cir.), petition for cert. filed on other grounds, 43 U.S.L.W. 3128 (U.S. July 27, 1974) (No. 74–24).

34. The defendant's argument is also confusing. It may assert that resale price agreements are the only sort of price-fixing condemned by § 1: "Absent a resale, there would seem to be no illegal price fixing." Memorandum in Support of Defendant's Motion for Summary Judgment 10. Such an assertion would be nonsensical, see, e. g., Plymouth Dealers Ass'n v. United States, 279 F.2d 128 (9th Cir. 1960), and the discussion in the text assumes that the defendant had some other argument in mind.

It appears to be based on the assumption that a company can fix the price at which it will sell its own product and is somewhat analogous to the rule that where the title and risk of loss of goods remain with the manufacturer, and the dealer's function is merely that of an agent, the manufacturer may maintain control of the prices to be charged. United States v. Arnold, Schwinn & Co., 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967). However, this rule is heavily dependent on "the ancient rule against restraints on alienation" of chattels, 388 U.S. at 380, 87 S.Ct. at 1866, which was stated in Dr. Miles Medical Co. v. John D. Park & Sons, 220 U.S. 373, 404–405, 31 S.Ct. 376, 55 L.Ed. 502 (1911), on the authority of Coke's Commentary on Littleton! Those precedents are inapposite where, as here, chattels are not involved. The general rule against price-fixing should apply. Indeed, even if Olsten and its franchisees were selling chattels it would not be clear that the defendant would benefit from those precedents: by admittedly giving the franchisees the option to reject doing business with the national accounts Olsten imposed fewer restraints upon them than are the norm in an agency relationship. The relationship of the parties in this case, in other words, is substantially different than that which the Court held necessary to permit price control by the principal in *Arnold, Schwinn & Co.*

The defendant also argues that any effects on trade that paragraph 5 might have are not "restraints of trade" condemned by § 1 but are instead beneficial: "the national accounts system at issue actually enhances competition by establishing horizontal competition between Franchisors and other national companies supplying personnel services on a competitive level which could not otherwise exist." [35] Olsten stresses that in soliciting national accounts it was acting in the best interests of the franchisees. Neither argument will allow the defendant to escape § 1, however: the essence of a per se violation is to deny resort to such arguments. Price-fixing is "conclusively presumed to be unreasonable." United States v. McKesson & Robbins, Inc., 351 U.S. 305, 310, 76 S.Ct. 937, 100 L.Ed. 1209 (1956).

### Conclusion

On the plaintiffs' (nonmovants') view of the facts, paragraph 5 clearly would be an illegal price-fixing agreement. Thus the dispute as to its import is material to the case. Because a genuine issue as to a material fact has been shown, summary judgment may not be entered pursuant to Fed.R.Civ.P. 56(c) as to the claim that paragraph 5 violates Sherman Act § 1. Summary judgment will be entered, however, in favor of the defendant on the claim that paragraph 14 infringes the antitrust laws. It is

So ordered.

---

35. Defendant's Memorandum, *supra* note 34, at 10.