**In re COORDINATED PRETRIAL PROCEEDINGS IN WESTERN LIQUID ASPHALT CASES.**

**This Document Relates to COPP PAVING COMPANY, INC., et al., Plaintiffs,**

**v.**

**GULF OIL COMPANY et al., Defendants.**

**Civ. No. C–71–608–RES.**

United States District Court, N. D. California.

Oct. 15, 1979.

Martin M. Shapero, Corinblit & Shapero, Los Angeles, Cal., for plaintiffs.

Brobeck, Phleger & Harrison, San Francisco, Cal., Richard W. Curtis, Gulf Oil Corp., Los Angeles, Cal., for defendants.

## OPINION AND ORDER

RUSSELL E. SMITH, District Judge.

This case, initially filed in the Central District of California, was transferred to the Northern District of California by the Panel on Multidistrict Litigation as one of the Western Liquid Asphalt cases. It alone of the Western Liquid Asphalt cases involved commerce in asphaltic concrete, a mixture of liquid asphalt and aggregate. Because asphaltic concrete cannot be moved long distances, and in this case was not moved between states, a question as to whether the court had jurisdiction of the plaintiffs' various Sherman, Clayton, and Robinson-Patman Acts antitrust claims arose. The district court disclaimed jurisdiction of all claims. The circuit court held that there was jurisdiction of all claims. The Supreme Court granted certiorari as to the Clayton and Robinson-Patman Act claims and decided that the district court did not have jurisdiction of the claims under Section 2(a) of the Clayton Act as amended by the Robinson-Patman Act, 15 U.S.C. § 13(a), and under Sections 3 and 7 of the Clayton Act as amended, 15 U.S.C. §§ 14 and 18. *Gulf Oil Corp. v. Copp Paving Co.,* 419 U.S. 186, 95 S.Ct. 392, 42 L.Ed.2d 378 (1974). The liquid asphalt claims were dismissed for want of prosecution; the asphaltic concrete claims were dismissed pursuant to stipulation as to the defendant Edgington Oil Company. The action now pends on plaintiffs' claims under Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1 and 2) against Gulf Oil Company, Union Oil Company, Sully-Miller Contracting Company, and Industrial Asphalt Inc.

The parties here engaged in massive discovery, and the court ordered, in Pretrial Order No. 8, supplemented by an order dated February 9, 1976, that pretrial briefs be filed detailing in simple sentences the facts relied upon by the plaintiff and containing specific references to the evidence supportive of the fact statements.[1] In response to the court's orders, a pretrial brief was filed and amended. In passing on the defendants' motions for summary judgment I have assumed that plaintiffs have stated all that they are able to state. I have assumed the authenticity of the documents and the truth of the statements in the documents, even though some of them would, in the present posture of the case, be hearsay. I have, in stating the facts, assumed the truth of some of Copp Paving Company's contentions, which may not be supported by the record.

Copp Paving Company, Inc. (Copp) was a paving contractor. In 1960 it built a hot plant. A hot plant mixes liquid asphalt and aggregate and then heats it to make asphaltic concrete. Following the erection of the hot plant, Copp sold asphaltic concrete to other paving contractors and used it in its own paving jobs. Its market was in one area in the Los Angeles basin bounded by Whittier Boulevard on the north, Lakewood Boulevard on the west, Pacific Coast Highway on the south, and Highway 39 on the east. Copp procured its liquid asphalt from Edgington Oil Company. In 1960 there were numerous independent paving contractors, i. e., contractors in no way controlled by the suppliers of liquid asphalt competing in that area. The largest of Copp's competitors were Industrial Asphalt Company (Industrial) and Sully-Miller Paving Company (Sully-Miller), each of which had numerous hot plants in southern California. Gulf Oil Company (Gulf) and Union Oil Company (Union) are major oil companies with refineries located in California.

In 1963 Gulf acquired Industrial and thereafter controlled it. After the acquisition, Industrial marketed all of the asphalt produced by Wilshire Oil Company, acquired by Gulf in 1964. Industrial also operated the hot plants but did not place asphaltic concrete. In 1964 Union acquired Sully-Miller and thereafter controlled it. Sully-Miller continued to operate the hot plants, sold some asphaltic concrete, and used asphaltic concrete in its paving business. It used liquid asphalt produced by Union.

It is economically sound for a refinery to produce liquid asphalt as one of the products of petroleum refining. There was a glut of liquid asphalt on the market in southern California in the early 1960's and both Gulf and Union were motivated to acquire control of the hot plants owned by Industrial and Sully-Miller to insure a market for their own production of liquid asphalt.

As has been previously indicated, any claims that Copp may have, by reason of any antitrust activity as to liquid asphalt, have been dismissed,[2] but it is assumed for the purposes of this opinion that a fact-finder might conclude from the evidence that, by various devices such as dumping, price agreements, allocation of markets, exchange agreements, and diversions of imported oil, the major oil companies and the defendants here did fix the prices of liquid asphalt. It is likewise assumed that Gulf and Union did, by loans, by discounts on the purchase of liquid asphalt, and otherwise, artificially subsidize their subsidiaries. These infusions of cash and other benefits from Gulf and Union, the parent companies, did enable Industrial and Sully-Miller to purchase other hot plants and advantageous rock quarries, but there is no evidence that rock quarries or hot plants were acquired which Copp needed or wanted to acquire, or that these acquisitions injured Copp except

1. The orders required that briefs be filed similar in form and content to Sample Pretrial Order No. 5 contained in the Manual for Complex Litigation, 1 Moore's Federal Practice, Part II— Appendix, p. 321 (2d ed. 1978).

2. Had Gulf and Union, by controlling the price of liquid asphalt, engaged in predatory activity in the asphaltic concrete business, that predation would be unlawful, but, as later discussed, there is no proof of that.

as they improved Industrial's and Sully-Miller's capacity to compete. It may be assumed that the defendants made loans to other hot plant owners to insure the sale of liquid asphalt to their hot plants. It may also be assumed that in the sale of asphaltic concrete and in the paving of roads Industrial and Sully-Miller were able to compete more effectively than Copp by reason of their relationships with Gulf and Union.

At the asphaltic concrete level, however, and Copp was not dealing in liquid asphalt as such, the evidence shows that there was vigorous competition, and there is nothing to show, either directly or inferentially, that there were any agreements or conspiracies as to the price or the allocation of markets of any kind. Gulf did control Industrial and Union did control Sully-Miller, and whatever was done in producing or selling asphaltic concrete was in a sense done by agreement between the parents and their respective subsidiaries. There is no evidence of any kind bearing on the comparative prices charged by Industrial, Sully-Miller, and Copp for asphaltic concrete, f.o.b. hot plant or in place, or of any bids which took business from Copp and placed it with Industrial or Sully-Miller. There is no showing of the business done by Copp at the beginning of the damage period and at the end of it. There is no evidence that at any time either Industrial or Sully-Miller sold asphaltic concrete, f.o.b. hot plant or in place, at less than any kind of a cost.[3] In fact, the evidence shows that asphaltic concrete was sold by the defendants at a profit. Perhaps Industrial and Sully-Miller did not make as much profit as they might have made had the parent companies been less generous. But proof falls short of showing predatory conduct, i. e., that in general or in any specific sale asphaltic concrete was priced "at nonremunerative levels in order to exclude or drive out rivals." *Janich Bros., Inc. v. American Distilling Co.,* 570 F.2d 848, 850 (9th Cir. 1977).[4] It is assumed that Industrial and Sully-Miller did produce and sell a greater percentage of their plant capacity than did Copp and were therefore better competitors, but how the Copp sales compared before and after the acquisitions by Gulf and Union is not shown.

The question then arises whether all of this forms any basis for an action under either Sections 1 or 2 of the Sherman Act.

 As to Section 1 of the Sherman Act, there were no express agreements between the parent companies and their subsidiaries to control prices or restrain competition in asphaltic concrete. The parent companies knew what the subsidiaries were doing, and if the effect of what was done was to restrain competition unlawfully, then in that sense there were agreements in restraint of trade. But the most that can be claimed by Copp is that Gulf and Union, because of their wealth, made better competitors out of Industrial and Sully-Miller to the disadvantage of Copp. This, in and of itself, is not enough, however, to constitute a conspiracy which violates Section 1 of the Sherman Act, even if it is assumed that in a case such as this there could be a

---

**3.** There was evidence that in one year Sully-Miller lost $327,512.00. This loss, however, was attributable to one contract for rock excavation which bore no relationship to asphaltic concrete.

**4.** Copp relies on statements by Sully-Miller's competitors, such as:

"Many customers of Industrial Asphalt would be forced out of business. They would be unable to compete with Sully-Miller. A contractor like Sully-Miller owning its own asphalt plants usually bid jobs on the basis of taking only one small profit on the contracting portion of the contract.

"Goode & Schroeder, Inc. which is Industrial Asphalt's largest customer in the San Fernando Valley, could not compete on an equal basis with Sully-Miller. They have tried it on many occasions in the Irwindale and Orange County Areas, and failed badly. Therefore it is reasonable to believe that the same situation will occur in the San Fernando Valley unless Industrial Asphalt acquires Southwest Paving Company."

The foregoing is from a report by an officer of Industrial which was enclosed in a letter dated October 2, 1963. This was before Union acquired Sully-Miller and before the purchase of Industrial by Gulf became final. While this statement speaks of cut-rate pricing, it does not suggest a pricing below cost, but rather states that Sully-Miller was taking a small profit.

conspiracy between a parent company and its wholly-owned subsidiary.[5] The purpose of the antitrust laws is to protect the competitive system. They do not forbid competition, and they are not designed to protect inefficient competitors. The rule of reason applicable to Section 1 of the Sherman Act does not restrain competition as such. *United States v. American Tobacco Co.,* 221 U.S. 106, 31 S.Ct. 632, 55 L.Ed. 663 (1911). *See Knutson v. Daily Review, Inc.,* 548 F.2d 795 (9th Cir. 1976); *Hanson v. Shell Oil Co.,* 541 F.2d 1352 (9th Cir. 1976). In the absence of predatory conduct, the agreements of the kind here shown between the parents and their subsidiaries are not violative of the Sherman Act unless the rule announced in *United States v. First National Bank & Trust Co.,* 376 U.S. 665, 84 S.Ct. 1033, 12 L.Ed.2d 1 (1964), is applicable here. Under that case, the question is: does mere size make what otherwise would be lawful conduct unlawful?

In the *First National Bank* case, the First National Bank, which had about 40% of the assets, deposits, and loans in Fayette County, Kentucky, acquired the Security Bank, a competitor, which had about 12% of the assets, deposits, and loans in that county. The consolidated bank then had over 50% of all of the assets, deposits, and loans in the county. It was held that significant competition had been eliminated and that the acquisition alone, unaccompanied by any predatory intent, violated Section 1 of the Sherman Act. The rule that acquisition alone violates Section 1 of the Sherman Act is not applied in this case, first, because *First National Bank* was concerned with competing banks; second, the opinion refers to competitors and uses such words as "where merging companies are major competitive factors in a relevant market"; and, third, there is a difference in the effect of what was done in *First National Bank* and what was done here. In a vertical merger of noncompeting companies, there are just as many competitors after the merger as before. That is not so where competitors merge, as in the *First National Bank* case.

There were, it is true, acquisitions of hot plants by Industrial and Sully-Miller after the mergers with Gulf and Union, but there is simply no evidence from which it can be determined which horizontal acquisition affected what market, in percentages of asphaltic concrete sold or in numbers of hot plants, or what the competitive situation was before or after any merger. From the evidence it cannot be said, as it was in *First National Bank* at 671–72, 84 S.Ct. at 1037, that in any single instance, or in the aggregate, the "merging companies are major competitive factors in a relevant market" and that there was "the elimination of significant competition between them." It is also argued that during the damage period Gulf and Union and other major oil companies dominated the asphaltic concrete market and that the independent hot plant owner, *i. e.,* an owner with no connections with a liquid asphalt supplier, could not compete. Again, however, there is no proof of predatory conduct, and the failure of the independent to compete successfully was due to its inability to match the prices and service of its competitors. Competition was doing what competition was supposed in theory to do: improve the position of the consumer. Copp was not entitled to the preservation of a business structure in which the producer of liquid asphalt, the manufacturer of asphaltic concrete, and the contractor putting the concrete in place each made a profit. If Union, selling asphalt to Sully-Miller, could avoid a marketing cost and pass that saving on to Sully-Miller, and if Sully-Miller then could use that asphalt to make asphaltic concrete and put that concrete in place at a price which Copp could not meet, then Copp was the victim of competition, but not the kind forbidden by Section 1 of the Sherman Act.

■ In a somewhat different effort to characterize the agreements between Gulf and Industrial and Union and Sully-Miller as being in restraint of trade, Copp charges that the infusions of capital into Industrial

5. *See Knutson v. Daily Review, Inc.,* 548 F.2d 795 (9th Cir. 1976); *Joseph E. Seagram & Sons,* *Inc. v. Hawaiian Oke & Liquors, Ltd.,* 416 F.2d 71 (9th Cir. 1969).

and Sully-Miller, the interest-free loans, the sales of asphalt at a discount, and the subsidization by Gulf of Industrial's loans to purchasers of liquid asphalt were reckless and therefore within the rule mentioned in *England v. Chrysler Corp.*, 493 F.2d 269, 273 (9th Cir. 1974).[6] Even though it is not shown either that liquid asphalt was sold by Gulf and Union at any loss or that asphaltic concrete was sold by Sully-Miller at any loss, it is assumed that these dealings were somehow reckless. Even so, the rule mentioned in *England* is not applicable here. In that case Chrysler Corporation was, through its subsidiary retailer, selling cars at retail in competition with another retail dealer. In *Rea v. Ford Motor Co.*, 355 F.Supp. 842 (W.D.Pa.1973), cited in *England,* Ford Motor Company was selling at retail through factory-owned stores and controlled, dominated dealer development stores, which were in competition with independent dealers. There was also direct evidence of a purpose to control the retail market. In *Industrial Building Materials, Inc. v. Interchemical Corp.*, 437 F.2d 1336 (9th Cir. 1970), also cited in *England,* Presstite, the wrongdoer, was a manufacturer engaged in direct competition with its independent dealer for the purpose of eliminating that dealer. Again, neither Gulf nor Union was in competition with Industrial and Sully-Miller, and before the otherwise lawful agreements between them can be held to be in restraint of trade the evidence must prove or warrant an inference of predatory conduct.

■ Was there a violation of Section 2 of the Sherman Act? There was no evidence that in the sale of asphaltic concrete there were any agreements or combinations of any kind between Gulf and Union. Both were vitally interested in selling liquid asphalt through their subsidiaries. They watched each other's asphaltic concrete op-erations closely and tried to counter each other's activities in the asphaltic concrete market. Other major oil companies were likewise interested in the asphaltic concrete business and carefully watched the competitive developments at the hot plant level.

There is basically no evidence from which a monopoly power could be inferred. The paucity of the evidence is demonstrated by Copp's brief, which does not understate the evidence. Thus Copp quotes from a letter written in 1968 by one Richfield executive to another, as follows:

There are 101 permanent hot plants in our marketing territory [southern California]. Of these, 64 are controlled as indicated:

| | | |
|---|---|---|
| Industrial Asphalt | 35 | — in our area, owned by Gulf. |
| Sully-Miller | 17 | — owned by Union |
| Hooker and Black Top | 4 | — owned by Newhall |
| Vernon-Ventura Paving | 6 | — large loan by Douglas. |
| Associated Asphalt | 1 | — stock ownership by Edgington. |
| Copp Paving | 1 | — financial help—very small and not too sound. |
| Total plants | 101 | |
| Controlled | 64 | |
| | 37 | Potential |
| We have | 6 | |
| Net | 31 | |

Of the 31, there are three accounts that have a very desirable volume.

Copp then asserts:

The rising percentage of control of the immediate adjacent Orange County area, which in small percentage lapsed over into the Copp area of business, is reflected in Ex. 0–19024 which demonstrates Sully-Miller to control 55% of the market with Industrial controlling 22% of the market and about to acquire an additional 5% by taking over the Swigart Plant.

The (*sic*) Sully-Miller and Industrial thus control 82% of the adjacent Orange County market, by admission.

Copp's Memo dated June 12, 1978, p. 26. Again, if we assume that the relevant mar-

---

**6.** "It may well be that the predominant emphasis on market penetration, which results in the deliberately reckless operation of a subsidized retailer and which has the inevitable effect of forcing competing and non-subsidized dealers to function at an unprofitable level, could, if proved, constitute an unreasonable restraint of trade. *See Rea v. Ford Motor Co.*, 355 F.Supp. 842, 863–871 (W.D.Pa.1972); *cf. Industrial Building Materials, Inc. v. Interchemical Corp.*, 437 F.2d 1336, 1341–1343 (9th Cir. 1970)."

ket was asphaltic concrete,[7] proof that two companies controlled 82% of the market in Orange County proves nothing as to the percentage of the market controlled in the Copp market area, even if Orange County does overlap a small part of that area. If the figures from the Richfield report are taken to be true, then Industrial, which did not compete with Copp in selling asphalt in place, had 35 out of 101, or 34.6% of all of the hot plants in southern California, and Union had 17 out of 101, or 16.8%. If all of southern California be treated as the market area (which it is not), neither Gulf and Industrial nor Union and Sully-Miller had a sufficient share of the market to warrant an inference that they had monopoly power in violation of Section 2 of the Sherman Act. See the cases cited in *Greyhound Computer Corp. v. International Business Machines Corp.*, 559 F.2d 488, 496 n. 18 (9th Cir. 1977). Since Industrial and Sully-Miller were competitors, and since there is no evidence of any combination between them as to asphaltic concrete, their percentages of the market cannot be aggregated for the purpose of drawing inferences as to the power to control the market.

■ There is no proof of an attempt to monopolize the asphaltic concrete market. It is required that there be proof of: 1) a "specific intent to control prices or destroy competition with respect to a part of commerce"; 2) "predatory conduct directed to accomplishing the unlawful purpose"; and 3) a "dangerous probability of success." *Janich Bros. v. American Distilling Co.*, 570 F.2d 848, 853 (9th Cir. 1977). While in this circuit, under *Janich,* a short-cut method of establishing elements (1) and (3) by proof of element (2) may be employed, there is here no proof of predatory conduct. The fact, if it be a fact, that a seller of asphaltic concrete, f.o.b. the hot plant, cannot compete unless he is connected in some way to a liquid asphalt producer does not tend to prove a monopoly. As previously indicated, it proves nothing more than that the business structure has changed and that a given kind of competitor cannot compete in a truly competitive market.

IT IS THEREFORE ORDERED that judgment be entered denying plaintiff all relief on all of the counts in the complaint.

---

7. Copp and Sully-Miller both received most of their revenue from the sale of asphaltic concrete in place.