## MARTIN B. GLAUSER DODGE CO.

### v.

**CHRYSLER CORPORATION, Chrysler Motors Corporation, Chrysler Financial Corporation, Chrysler Credit Corporation, Chrysler Realty Corporation, Appellants.**

Nos. 76–2390 and 77–1188.

United States Court of Appeals, Third Circuit.

Argued Sept. 9, 1977.

Decided Nov. 14, 1977.

William E. Reifsteck, Farr, Reifsteck & Wolf, Professional Corp., Haddon Heights, N. J., for Chrysler Financial Corp. and Chrysler Credit Corp.

Robert S. Ryan, Michael O'S Floyd, Catherine B. Strauss, Drinker, Biddle & Reath, Philadelphia, Pa., John P. Hauch, Jr., Archer, Greiner & Read, Professional Corp., Haddonfield, N. J., for Chrysler ·Corp., Chrysler Motors Corp. and Chrysler Realty Corp.

Tom P. Monteverde, Morris L. Chucas, Max L. Lieberman, Pelino, Wasserstrom, Chucas & Monteverde, Philadelphia, Pa., for Martin B. Glauser Dodge Co., appellee.

Before GIBBONS, WEIS and GARTH, Circuit Judges.

## OPINION OF THE COURT

GIBBONS, Circuit Judge.

This is an appeal from a final judgment of the District Court denying defendants' motions for judgment notwithstanding the verdict or for a new trial, after a jury verdict in favor of the plaintiff on its claim for money damages under § 4 of the Clayton Act[1] for alleged violations of § 1 of the Sherman Act.[2]

The plaintiff, Martin B. Glauser Dodge Co. (hereinafter Glauser Dodge) is a family-owned New Jersey corporation which formerly operated a franchised Dodge automobile dealership in Vineland, Cumberland County, New Jersey. The defendants are Chrysler Corporation, three of its wholly owned subsidiaries—Chrysler Financial Corporation, Chrysler Realty Corporation, and Chrysler Motors Corporation—and Chrysler Credit Corporation, a wholly owned subsidiary of Chrysler Financial Corporation (hereinafter collectively Chrysler). Although separately incorporated, each of the defendant subsidiaries is part of an integrated Chrysler enterprise engaged in the manufacturing and marketing of auto-

---

1. 15 U.S.C. § 15 (1970):

 Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of the suit, including a reasonable attorney's fee.

2. 15 U.S.C. § 1 (1970):

 Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal . . . .

 In its complaint, plaintiff also alleged violations of the Robinson-Patman Act, 15 U.S.C. § 13(a) (1970), and of § 2 of the Sherman Act, 15 U.S.C. § 2 (1970). At the close of the evidence, however, these claims were dismissed.

mobiles, including, at the relevant time, Dodge automobiles.[3]

This case requires that we explore once again the antitrust implications of competition between independently owned franchised retail dealers and franchised retail dealers established by the manufacturer under the well-known Dealer Enterprise (DE) program.[4] In denying defendants' motions, the District Court held that there was sufficient evidence to support the jury's verdict that the defendants' subsidizing of their partially owned dealers without providing similar assistance to independent dealers constituted an unreasonable restraint in violation of § 1 of the Sherman Act. We conclude that the Court erred in denying defendants' motion for judgment notwithstanding the verdict, and we reverse.

I

THE DEALER ENTERPRISE PROGRAM

Critical to the understanding of the antitrust issues presented by this case is an understanding of the emergence of the DE program in the automobile industry, for without that understanding it is impossible to appreciate the operation of that program in what plaintiff contends is the relevant market at the relevant time. To a great extent the structure of automobile distribution is common economic knowledge and has been described in varying details in the cases referred to in note 3. The description which follows, however, is developed from

the evidence in this case—in particular plaintiff's exhibits P–7 and P–8. Exhibit P–7 is a lengthy memorandum prepared in August of 1961 by E. C. Quinn, Sales Vice President of Chrysler, setting forth the reasons why Chrysler should embark on an expanded DE program. Exhibit P–8 is a letter dated April 12, 1962, from Mr. Quinn to all Chrysler Motors Corporation personnel on the subject "Sales and Marketing Representation Programs" outlining the deficiencies in Chrysler's distribution system and discussing remedies.

Automobile manufacturing, to state the obvious, is a capital intensive business in which investment in large manufacturing facilities achieves economies of scale and, if those facilities are utilized at or near capacity, lower unit costs and higher unit profits. Automobile retailing and servicing, on the other hand, requires wide dispersion of individual facilities, each typically requiring relatively low capital investment and, like many other retail businesses, operating on low unit profits but sometimes high returns on capital investment. But while capital investment in an individual automobile retailing establishment typically is small, the total capital investment in all such facilities is enormous. Historically, the automobile manufacturers have preferred to concentrate their investment in manufacturing facilities, leaving automobile retailing to private venture capital. This historical pattern, while offering the industry the advan-

---

3. Chrysler Motors Corporation engages in distribution, while Chrysler Financial Corporation provides capital for the entire Chrysler financial operation. Chrysler Realty acquires, develops, and administers property for Chrysler dealer sites. Chrysler Credit Corporation extends wholesale credit to and purchases retail installment contracts from Chrysler dealers.

4. Aspects of the automobile industry's DE program have been considered in other cases without definitive results. See Coleman Motor Co. v. Chrysler Corp., 525 F.2d 1338 (3d Cir. 1975), vacating and remanding 376 F.Supp. 546 (W.D. Pa.1974); Rea v. Ford Motor Co., 497 F.2d 577 (3d Cir.), cert. denied, 419 U.S. 868, 95 S.Ct. 126, 42 L.Ed.2d 106 (1974), reversing and remanding 355 F.Supp. 842 (W.D.Pa.1973); England v. Chrysler Corp., 493 F.2d 269 (9th Cir.), cert. denied, 419 U.S. 869, 95 S.Ct. 127, 42

L.Ed.2d 107 (1974); Mt. Lebanon Motors, Inc. v. Chrysler Corp., 283 F.Supp. 453 (W.D.Pa. 1968). None of these cases sustained a judgment against a manufacturer because of the operation of the DE program. However, several cases recognized the possibility that in appropriate circumstances an independently owned dealer could recover for injury to his business or property caused by the competition of a DE dealer. See, e. g., Coleman Motor Co. v. Chrysler Corp., supra, at 1343–48; Mt. Lebanon Motors, Inc. v. Chrysler Corp., supra, at 456–61. An appeal is pending in this court from an order granting defendants' motion for judgment notwithstanding the verdict in favor of the same defendants involved in the instant case. Elfman Motors, Inc. v. Chrysler Corp., No. 72–1282 (E.D.Pa. August 9, 1977).

tage of being able to concentrate its resources in the manufacturing end, had the disadvantage that those manufacturing resources could not be used to near capacity and hence could not be profitable, if private venture capital investment at the retail end, and thus sales, failed to increase in proportion to manufacturing capacity. That, unfortunately, is what occurred in the late 1950s. This pattern is reflected in the following table of Manufacturers' and Dealers' Net Worth at Year End, which appears in Exhibit P–7: [5]

| | The Five Auto Manufacturers | All Franchised New Car Dealers |
|---|---|---|
| 1954 | $5.9 | $4.4 |
| 1955 | 7.2 | 4.1 |
| 1956 | 7.5 | 4.3 |
| 1957 | 8.1 | 4.3 |
| 1958 | 8.2 | 4.4 |
| 1959 | 8.9 | 4.2 |
| 1960 | 9.7 | 3.9 |

The increase in manufacturers' net worth, in a period during which the investment in the separately owned retail industry on which utilization of manufacturing capacity depended was level or declining, created a serious problem for the whole industry. Between 1950 and 1962 the number of automobile dealers in this country declined from 47,000 to 32,000. See Exhibit P–8.

In part at least, the inability of the retail end of the business to keep old or attract new venture capital was the result of the same forces which have destroyed retail centers nationwide. With dispersion and suburbanization, the once familiar city "automobile row" became as anachronistic as the once familiar row of downtown department stores. At the same time, suburbanization created the need for new and different retail sales and service locations. And unlike soft goods retailing, in which some retailing giants had the capacity to move with the times, there were few giants among the automobile retailers. Undoubtedly the manufacturers contributed to the decline as well, by factors such as model proliferation, which tended to put pressure on already narrow retail mark-ups. But whatever the cause, the effect was clear—and serious.

In Chrysler's case the effect was deadly serious. As a result of recent investment in research, production, and manufacturing facilities, which Quinn estimated at over nine hundred million dollars, see Exhibit P–8, Chrysler in 1962 had a production capacity of 1.3 million cars a year, while its unit sales had declined from a 1955 high of 1,206,195 to 311,899 and from a high of 21.8% of industry sales in 1951 to about 11%. See Quinn Memorandum, Exhibit P–7. Quinn's memorandum discloses that as of June 30, 1961, Chrysler had about two thousand open retail points where retail dealers should be located but were not, including 753 open Dodge points. He estimated that the open points represented a loss of sales of 150,000 units a year. He also pointed out that many existing dealers were falling short of Chrysler's estimate of market potential for their point of sale and that this resulted in a sales shortfall of 310,000 units. Thus an inadequate retail dealer network produced a shortfall in sales of between 400 and 500 thousand units, which, as the decline in Chrysler's percentage of total industry sales showed,[6] had been diverted to its manufacturing competitors. Moreover, the percentage of Chrysler dealers who operated at a loss was substantially higher than for the automobile industry as a whole. Quinn's memorandum concluded that the profit record of automobile dealerships as a whole and of Chrysler dealers in particular would preclude resort solely to private venture capital in order to replace unsatisfactory dealers and that, to fill the essential new points then open, Chrysler would have to use its own resources.

Investment by automobile manufacturers in retail dealers was not in 1961 an unheard of phenomenon. This court accurately sum-

---

5. Automobile Manufacturers' Annual Report and Annual Report of the National Association of Automobile Dealers' Association (numbers in billions of dollars).

6. See Plaintiff's Exhibit P–6: Chrysler Corporation, Financial and General Fact Book, Chart on The Competitive History of the Automobile Industry as shown by New Passenger Car Registrations.

marized the DE program in *Coleman Motor Co. v. Chrysler Corp.*, 525 F.2d 1338, 1341 (3d Cir. 1975):

> Prior to 1954, Chrysler followed the conventional practice of marketing its automobiles through independent franchised dealers for resale to the public. In 1954, Chrysler began to franchise dealers as well under the Dealer Enterprise (D.E.) Plan. Under this plan, Chrysler supplied up to 75 percent of the capital needed to finance a new dealership. The plan, similar to those previously adopted by General Motors and Ford, provides that the 25 percent owner becomes president and general manager of the dealership and that he ultimately may purchase Chrysler's entire interest in the dealership out of his share of profits. Until such time, however, Chrysler retains majority control at the shareholder and board of directors levels.

In 1961, however, something more was needed. Quinn suggested certain refinements of the DE program, chief of which was the availability of an escrow fund as a method of accumulating out of profits to the credit of an operator his 25% share of the investment. The DE program was not the only program under consideration, however. Quinn calculated that to fill in the two thousand open retail points and to replace or revitalize the dealerships which were falling short of sales potential for their points, Chrysler would in addition have to resort to a combination of steps, including the purchase and lease to dealers of retail facilities, the guarantee of dealer leaseholds, the provision of capital loans to dealers, and the absorption of the start-up expenses of new dealerships. He estimated that the total cost of repairing the two major deficiencies in the dealer organization—open points and lost sales dealers— would include capital cost of $122,600,000, expenses of $42,800,000, and contingent liabilities on lease guarantees of $118,500,000. He also recognized that an attempt to make such an investment quickly would be both wasteful and ineffective by reason of the control which the sales-ownership ratio (the ratio in which owners of one brand of car repurchase the same brand) exercises over the rate of volume increase. Thus he projected that a period of up to ten years would be required to accomplish the necessary restructuring of the Chrysler retail dealer network. He suggested proceeding in selected market areas with annual appropriations of $10,000,000 for capital expenditures, $4,000,000 for expense, and $10,000,000 for contingent liability in the 1962, 1963, and 1964 model years.

Quinn's suggested program was adopted by Chrysler. However, Exhibits P–7 and P–8 make clear that Chrysler's first choice remained resort to retailers owned by private venturers, with the Quinn program operating only as a supplement.[7]

## II

## GLAUSER DODGE: HISTORY AND COMPETITION FROM DE DEALERS

Glauser Dodge opened a private venture capital Dodge dealership in Vineland, New Jersey, in 1964. The dealership was conducted by Martin B. Glauser and his three sons. It was originally programmed by Chrysler to sell approximately 111 new vehicles per year. However, Glauser Dodge quickly exceeded that sales goal by more than 200%, becoming the largest private venture capital Dodge dealer in Southern New Jersey. It expanded its operations from one to three facilities in Vineland, acquired a five-acre tract of land for a new consolidated facility, and in December of 1968 began construction of that new facility. The new facility cost $315,000, of which $260,000 was provided by a bank loan.

---

7. That the expanded DE program was intended only as a temporary, supplemental program is evidenced most by statements by Quinn himself in Plaintiff's Exhibit P–7:

> In all instances in which Chrysler invests its capital the goal is the ultimate buyout of that dealership by the dealer operator and his eventual owning it in total.
>
> Chrysler Motors Corporation has no desire to be in the automobile retail business.

Glauser Dodge contends, and Chrysler disputes, that Glauser Dodge's operations were both high volume and profitable until 1969.

In 1964, when Glauser Dodge commenced business, Chrysler had already embarked on the process of filling in points in Southern New Jersey pursuant to the Quinn program. One DE dealership, Crescent Dodge, was already in operation at Collingswood, Camden County, New Jersey, more than 35 miles from Vineland. In 1965 a second DE dealership, Cherry Hill Dodge, was established at Cherry Hill, Camden County, New Jersey, about 35 miles from Vineland. Martin Glauser became the DE manager of Cherry Hill Dodge, while his sons continued to manage Glauser Dodge. After Martin Glauser's death in 1966, another DE manager was substituted at Cherry Hill. The new manager completed a buyout of Chrysler's interest in January, 1972. In 1967 Chrysler opened two additional DE dealerships—Cinnaminson Dodge at Cinnaminson, Burlington County, New Jersey, approximately 45 miles from Vineland, and Black Horse Dodge at Mt. Ephraim, Camden County, New Jersey, 31 miles from Vineland. Also in 1967 Chrysler closed out Crescent Dodge at Collingswood, which in the four years of its operations had never achieved a net profit. The DE manager at Cinnaminson bought out Chrysler's interest on June 1, 1970. Black Horse Dodge was purchased by its manager in 1974, after the verdict in this action. Thus, at the time of trial in the District Court, of the four DE dealerships which could have had an impact on Glauser Dodge's business or property, one had been closed, two had, pursuant to a DE purchase contract, been converted to private dealerships, and the fourth was operated by a manager who held a DE purchase contract.

In September, 1969, with its new facility ready for a grand opening, Glauser Dodge was experiencing cash flow problems. Chrysler Realty declined to act on a possible purchase and leaseback of the new facility. Chrysler Credit, which financed automobile

loans for Glauser Dodge on a recourse basis, increased its repossession rate on defaulted retail paper at about that time and demanded repurchase, thus further aggravating Glauser Dodge's cash flow problems. In March, 1970, three Glauser Dodge checks were returned for insufficient funds and an inventory check by Chrysler Credit showed that Glauser Dodge had sold cars on which a floor plan inventory loan was outstanding without accounting for the proceeds of sale. It was, in the parlance of the industry, out of trust. Although Glauser Dodge contended that various Chrysler subsidiaries owed it approximately the amount which it owed to Chrysler Credit, Glauser assigned to Chrysler Credit a mortgage on the new facility and turned over as additional security titles to previously unencumbered cars. It also obtained a $60,000 bank loan, out of which it made payments to creditors. Finally, it endeavored to obtain from Chrysler a guarantee of a proposed lease if outside investors would buy the facility and lease it back to Glauser. Chrysler declined to guarantee the lease because the rental was in its view too high for the planning potential for Vineland. The cash flow difficulties continued and, in July, 1970, Chrysler Credit repossessed Glauser Dodge's entire automobile inventory. Chrysler Credit then disposed of both the new and used car inventories at a loss. Hence, Glauser Dodge was out of business on July 31, 1970.

### III

### GLAUSER DODGE'S ANTITRUST ACTION

Glauser Dodge commenced this action in August, 1970, charging Chrysler with violations of the Robinson-Patman Act[8] and §§ 1 and 2 of the Sherman Act[9] in the operation of the DE program, which, it alleged, discriminated against private venture capital dealers. Chrysler answered, and Chrysler Credit Corporation filed a counterclaim for the balance due it. Chrysler Credit Corporation moved for summary

---

8. 15 U.S.C. § 13 (1970).

9. 15 U.S.C. §§ 1 and 2 (1970).

judgment on the counterclaim and obtained a judgment of $205,719.12, which was affirmed by judgment order on May 16, 1973.[10] The case went to trial on Glauser Dodge's antitrust claims on February 14, 1974. Throughout the trial, Glauser Dodge pressed the Robinson-Patman Act and the Sherman Act § 2 attempt to monopolize claims. At the end of the entire case, however, it abandoned these legal theories with prejudice, and the case was submitted to the jury solely under § 1 of the Sherman Act.

Glauser Dodge's § 1 theory, which was accepted by the District Court in its charge to the jury, was that several Chrysler corporate enterprises conspired with each other to restrain trade in relevant product and geographic markets [11] and that the restraints injured Glauser Dodge in its business or property. The crux of Glauser Dodge's antitrust claim is that it was unable successfully to compete because the DE dealers received benefits from Chrysler which were not available to Glauser. The District Court's charge to the jury outlined Glauser Dodge's claims: [12]

> [P]laintiff . . . complains that the Chrysler defendants combined or conspired in restraint of trade or commerce by adopting and pursuing the following course of conduct:
>
> A. The creation and maintenance of better financed dealer enterprise dealerships for the purpose of penetrating the automobile market in which DE dealers competed with the plaintiff to its loss;
>
> B. Permitting DE dealers or factory stores to operate regularly in an out of trust condition and not so with Glauser;
>
> C. Advertising and selling cars through factory controlled outlets or DE dealers at prices which were lower than independent retail dealers, such as the plaintiff, could afford to charge;
>
> D. Requiring private capital dealers, such as the plaintiff, to guarantee retail commercial paper while permitting competing DE dealers to sell such paper to Chrysler Credit without recourse;
>
> E. Refusing to deliver when properly ordered new vehicles to the plaintiff in time for its opening, even though an ample number of such vehicles were delivered to the DE dealers with whom the plaintiff competed;
>
> F. Effectively limiting by the use of recourse retail paper and other restrictions upon the plaintiff's credit the plaintiff's ability to participate in contests and specials on the same basis as competing DE dealers; and
>
> G. Providing superior physical facilities to DE dealers on terms which were not available to the competing private capital dealers such as the plaintiff Glauser.

The evidence offered in support of Glauser Dodge's § 1 theory of recovery was in some respects undisputed and in other respects hotly contested.

There is no serious dispute over the fact that the four DE dealers in Southern New Jersey received financing from Chrysler which the plaintiff did not receive. Chrysler Realty acquired facilities for these dealers and leased them on terms which were not offered to Glauser Dodge and which the jury could have found were unavailable to the latter from private real estate developers. Chrysler Credit Corporation purchased retail installment sales contracts from DE dealers on a without recourse basis, while its arrangement for purchases of such paper from Glauser Dodge required repurchase of defaulted installment contracts. As contemplated by the Quinn program Chrysler absorbed some of the annual losses involved in the start-up of DE dealers, but did not do so for Glauser Dodge. Chrysler Credit per-

---

**10.** *Martin B. Glauser Co. v. Chrysler Corp.*, 478 F.2d 1399 (3d Cir. 1973).

**11.** The relevant product market alleged by Glauser Dodge to be affected by the conspiracy consisted of the wholesale and retail markets for Dodge automobiles. The relevant geographic market consisted of counties in Southern New Jersey and in the Philadelphia area.

**12.** Since counsel for Glauser Dodge explicitly approved the District Court's charge to the jury, we are justified in quoting that charge as a summary of plaintiff's antitrust theory.

mitted some DE dealers to operate in an out of trust condition when they were experiencing cash flow problems, but declined to extend this accommodation to Glauser Dodge when it went out of trust. Each of these activities, which amounted to a Chrysler capital investment or expense at a DE retail point, was contemplated by the Quinn program, which also contemplated, whenever possible, reliance on private venture capital dealers such as Glauser Dodge.

Aside from these largely undisputed matters, Glauser Dodge produced evidence tending to show that DE dealers sometimes advertised for sale and sold cars at prices which were lower than private venture capital dealers, such as the plaintiff, could afford to charge. Chrysler denied that this was a regular practice and produced evidence that it took steps to halt low-price advertising by Cherry Hill Dodge, the dealer on which most of the plaintiff's price evidence centered. Also contested was Glauser Dodge's contention that for the 1969 Announcement Day, when new models were introduced, the DE dealers received many new cars while it received few. Looking at the contested evidence in the light most favorable to the plaintiff, the jury could have found that the DE dealers did subject private dealers to intense price competition and that the DE dealers obtained better deliveries for the 1969 Announcement Day.

After outlining Glauser Dodge's contentions as to the objects of the conspiracy,[13] the District Court submitted four interrogatories to the jury:

1. Did any of the defendants enter into any combination or conspiracy in unreasonable restraint of trade or commerce?

Answer yes or no.

2. If your answer to Question 1 is yes, then which defendants did combine or conspire. . . .

3. If your answer to Question 1 is yes, then was the plaintiff Glauser Dodge injured as a proximate result of such a combination or conspiracy.

Answer yes or no.

4. If your answers to Questions 1 and 3 are yes, state the amount of damages. . . .[14]

The Court's charge permitted the jury to answer question 1 affirmatively if it accepted one of the seven Glauser Dodge theories outlined above. The charge permitted the jury to answer question 3 affirmatively if it found

that plaintiff measurably competed with Dodge DE dealers in selling new Dodge vehicles in a relevant market and that Glauser was injured as a proximate result thereof. . . .[15]

The jury answered these interrogatories affirmatively and returned a verdict against the defendants, finding that they

13. *See* p. 79 *supra.*

14. Joint Appendix to Parties' Briefs, Vol. II, at 03339.

15. *See* Joint Appendix for Parties' Briefs, Vol. II, at 03357.

In the Court's charge, measurable competition in a relevant geographic market was defined thus:

If you find that the plaintiff had the capacity and the knowhow to compete with the defendant's DE dealers for sales and in fact advertised and attempted to gain measurable sales in any of the market areas in which any of the Dodge DE dealers made measurable sales, you may find that the plaintiff was in competition with such a store or stores. Also, if you find that any of the Dodge DE dealers made or through advertising or otherwise attempted to make measurable sales in areas in which the plaintiff made or attempt-

ed to make measurable sales, you should find that there was competition.
*Id.* at 03354. Later in the charge, the Court stated:

The test is simply whether the combination affects a definable market and whether it restrains an appreciable part of the trade in that market. The geographic area selected must, therefore, correspond to the commercial realities of the industry and be significant in an economic sense.
*Id.* at 03356.
The existence of a relevant product market was to be determined by the jury under this charge:

A manufacturer's product may constitute a relevant product market if competition has developed around it as a separate economic entity recognized by the manufacturers, by the competitors, and by consumer purchasers.

\* \* \* \* \* \*

had entered into a conspiracy in unreasonable restraint of trade. Damages were assessed at $1,300,000, which amount was trebled to $3,900,000. The defendants filed timely motions for judgment notwithstanding the verdict and for a new trial. On August 20, 1976, the District Judge filed an opinion stating that he would deny these motions if plaintiff would correct an error of $67,075 in the damage assessment by filing a remittitur of $201,225. Glauser Dodge filed the remittitur and the District Court denied defendants' post-trial motions. This appeal followed.

## IV

## LEGAL ANALYSIS OF SHERMAN ACT § 1 CLAIM: REASONABLENESS OF THE RESTRAINT UNDER § 1 OF THE SHERMAN ACT

 In order to sustain a cause of action under § 1 of the Sherman Act, the plaintiff must prove: (1) that the defendants contracted, combined, or conspired among each other; (2) that the combination or conspiracy produced adverse, anti-competitive effects within relevant product and geographic markets; (3) that the objects of and the conduct pursuant to that contract or conspiracy were illegal; and (4) that the plaintiff was injured as a proximate result of that conspiracy. Because we conclude that the defendants' activities were not illegal under § 1 of the Sherman Act—i. e., they did not constitute an unreasonable restraint—we need not decide the first, second, and fourth issues outlined above. For purposes of our analysis of the legality of the defendants' behavior, then, we will assume that the defendants combined or conspired with each other [16] and that the jury properly identified relevant product [17] and geographic [18] markets.

---

In this case the plaintiff claims that there is a separate wholesale market for new Dodge automobiles, that dealers who purchase Dodges for resale are not really free to substitute automobiles of another manufacturer if they find themselves in difficulty with Dodge, and that there is also a definable sub-market consisting of present Dodge owners for the retail sale of Dodge automobiles.

The defendant, on the other hand, claims the only relevant product market is the market shared by all new automobiles and that competition in such a market could not be adversely affected by the acts complained of.

Therefore, in considering this case, one of the issues which you must decide is whether there is a separate market for the wholesale or retail sale of new Dodge automobiles in Southern New Jersey or Philadelphia which could have been adversely affected by the combination or conspiracy complained of. *Id.* at 03355–57.

16. Chrysler argues that we should hold that a corporation cannot conspire with its vertically aligned subsidiaries since such a conspiracy introduces no new factor into the competitive situation. Chrysler concedes, however, that its position is foreclosed by this court's holdings in *Cromar Co. v. Nuclear Materials & Equip. Corp.*, 543 F.2d 501, 511–12 (3d Cir. 1976), and in *Coleman Motor Co. v. Chrysler Corp.*, 525 F.2d 1338 (3d Cir. 1975). Adopting Chrysler's view would require reconsideration of those authorities by the court in banc.

17. Glauser Dodge argues that because of the importance of maintaining intrabrand competi-

tion, *see Coleman Motor Co. v. Chrysler Corp.*, 525 F.2d 1338, 1347 (3d Cir. 1975), this court should recognize a *wholesale* Dodge market as the relevant product market. Glauser argues that since Dodge dealers buy only Dodge vehicles from the manufacturer, there is a total lack of cross-elasticity of demand at the wholesale level. In addition, Glauser argues that due to monetary investments and goodwill, the dealers themselves cannot easily switch to another brand of automobiles for distribution. Finally, Glauser emphasizes that Chrysler Credit was the only entity to which it could sell substantial amounts of retail paper, thereby strengthening its ties to Chrysler. Without expressing an opinion on the merits of this argument, we point out that a similar argument was accepted by the district court in *Joe Westbrook, Inc. v. Chrysler Corp.*, 419 F.Supp. 824 (N.D.Ga.1976).

Glauser Dodge also argues that this court should recognize a relevant retail market limited to new Dodge vehicles. In support of this argument, Glauser relies on testimony with regard to Dodge's conquest and loyalty rates. *See* Joint Appendix to Parties' Briefs, at 2132–36 (50% of new car buyers purchase the same make car as that which they previously owned).

Chrysler argues argues that the individual Dodge brand of automobiles cannot constitute a separate product market for purposes of a § 1 inquiry. Chrysler relies primarily on *Mogul v. General Motors Corp.*, 391 F.Supp. 1305 (E.D. Pa.1975), *aff'd,* 527 F.2d 645 (3d Cir. 1976), and

82

■ Unless the particular restraint falls within a category that has been judicially determined to be illegal per se, the legality of a restraint challenged under § 1 of the Sherman Act must be assessed under the rule of reason. *See United States v. Standard Oil Co.*, 221 U.S. 1, 60, 31 S.Ct. 502, 55 L.Ed. 619 (1911); *Coleman Motor Co. v. Chrysler Corp.*, 525 F.2d 1338, 1344 (3d Cir. 1975); *Mt. Lebanon Motors, Inc. v. Chrysler Corp.*, 283 F.Supp. 453, 456 (W.D. Pa.1968), *aff'd on other grounds*, 417 F.2d 622 (3d Cir. 1969).[19] The rule of reason standard is equally applicable to restraints affecting intrabrand competition, such as that alleged here, as it is to restraints affecting interbrand competition. *See Coleman Motor Co. v. Chrysler Corp.*, 525 F.2d 1338, 1344, 1346 (3d Cir. 1975).[20] Under the rule of reason standard, only those restraints upon interstate commerce which are unreasonable are proscribed by § 1 of the Sherman Act. In *Chicago Bd. of Trade v. United States*, 246 U.S. 231, 238, 38 S.Ct. 242, 244, 62 L.Ed. 683 (1918), Justice Brandeis' opinion for the Court outlined the analysis which must be undertaken in order to determine whether a particular restraint is unreasonable and therefore unlawful:

Every agreement concerning trade, every regulation of trade, restrains. To bind, to restrain, is of their very essence. The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition. To determine that question the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts. This is not because a good intention will save an otherwise objectionable regulation or the reverse; but because knowledge of intent may help the court to interpret facts and to predict consequences.

■ For purposes of our analysis here, the critical part of Justice Brandeis' opinion is its discussion of the role that the defendant's *intent or purpose* plays in the rule of reason test. The ultimate test of legality, of course, is whether the particular restraint promotes or impairs competition. But, as Justice Brandeis' opinion recog-

Coleman Motor Co. v. Chrysler Corp., 525 F.2d 1338, 1349 (3d Cir. 1975). Those cases did not decide this issue, however, since the passages referred to dealt not with § 1 cases, but with § 2 attempt to monopolize cases. As noted above, we find it unnecessary here to resolve the product market issue within the context of § 1 of the Sherman Act.

18. The determination of a relevant geographic market is normally a question of fact for the jury. *See United States v. Columbia Pictures Corp.*, 189 F.Supp. 153, 192 (S.D.N.Y.1960).

19. The standard for reviewing a denial of a motion for judgment notwithstanding the verdict is whether, considering the evidence in the light most favorable to the party against whom the motion was made, there is sufficient evidence to support the jury verdict. *See Coleman Motor Co. v. Chrysler Corp.*, 525 F.2d 1338, 1344 (3d Cir. 1975); *Andrews v. Dravo Corp.*, 406 F.2d 785, 789 (3d Cir. 1969).

20. Chrysler argues that the Supreme Court's recent decision in *Continental T.V., Inc. v. GTE*

Sylvania, Inc., 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed. 568 (1977), altered the weights to be given to interbrand and intrabrand competition within the rule of reason test and, consequently, that *Sylvania* mandates the entry of a judgment notwithstanding the verdict in the instant case. We do not agree that judgment n. o. v. is appropriate on that ground. By overruling *United States v. Arnold Schwinn & Co.*, 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967), the *Sylvania* decision eliminated a formalistic distinction under which certain territorial restrictions in the vertical distribution of the product were analyzed under the rule of reason standard, while others were labelled per se violations of § 1. *Sylvania* held that all such vertical territorial restrictions would be evaluated under the reasonableness inquiry. The Court's discussion of the significance of intrabrand and interbrand competition was intended merely to illustrate the error of *Schwinn's* formalistic distinction. It was not intended to affect the analysis under the rule of reason test.

nized, the intent or purpose underlying the restraint is a crucial variable in aiding the court to assess the competitive effects of the restraint.

Two prior decisions of this circuit—*Coleman Motor Co. v. Chrysler Corp.*, 525 F.2d 1338 (3d Cir. 1975), and *Rea v. Ford Motor Co.*, 497 F.2d 577 (3d Cir.), *cert. denied*, 419 U.S. 868, 95 S.Ct. 126, 42 L.Ed.2d 106 (1974)—considered the DE programs in automobile distribution.

In *Rea,* a privately capitalized Ford dealer sued Ford Motor Company (the manufacturer) charging that Ford's subsidization of its wholly-owned dealerships constituted an unreasonable restraint of trade in violation of § 1 of the Sherman Act.[21] The plaintiff introduced expert testimony that calculated plaintiff's damages as equal to the average subsidy per car provided to the Ford-owned dealerships times the number of cars sold by the plaintiff. In rejecting this theory, we held that the mere proof of a subsidy from the manufacturer to DE dealerships for the purpose of increasing market penetration did not establish a recoverable injury to a competing dealer under § 4 of the Clayton Act. 497 F.2d at 587–90. The *Rea* case did not rule out the possibility that a manufacturer could be liable for antitrust violations committed in its operation of retail outlets. *Id.* at 590. However, since the plaintiff there had not suffered an injury recoverable under the antitrust laws, the *Rea* court found it unnecessary to consider the legality of the manufacturer's distribution system under § 1 of the Sherman Act.[22]

This court in *Coleman* considered the same DE program, albeit in a different geographic market, as that presented in the instant case. In that case, the plaintiff averred that Chrysler's activities were *"intended* to achieve a Dodge sales structure composed primarily or entirely of several large Chrysler-owned dealerships."[23] Reviewing the evidence for possible jury findings, we concluded that "the jury could have concluded that Chrysler had accomplished its purposes of increasing Dodge sales and consolidating retail sales in the hands of several strong Chrysler-controlled dealerships."[24] Since it found trial errors, the court remanded the case for a new trial.

The opinion in *Coleman* suggests for present purposes the parameters of lawful activity under § 1 of the Sherman Act. More specifically, although the *Coleman* court acknowledged that the ultimate concern of the Sherman Act is with effects, not intent,[25] the opinion also relied, in large part, upon the purpose the jury could have found to underlie the DE program in the relevant market as a tool for gauging the competitive effects of that program within that market. Thus, *Coleman* teaches us that predatory activities which have the purpose of consolidating sales of a manufacturer's products in its wholly or partially owned dealerships may produce anti-competitive effects violative of the Sherman Act. In recognizing that restraints on intrabrand competition are cognizable under § 1 of the Sherman Act, *Coleman* reasoned that forward vertical integration in the automobile distribution system could eliminate competition among dealers of the same brand within a $200–300 per vehicle price jurisdiction, which arises because non-price

21. Plaintiff's suit in *Rea* was not based solely on § 1 of the Sherman Act. On the contrary, plaintiff also alleged violations of the Robinson-Patman Act, § 3 of the Clayton Act (15 U.S.C. § 1221 et seq.), and the common law of contracts.

22. The opinion in *Rea* stated explicitly that it was not deciding the question whether the manufacturer's activities violated § 1 of the Sherman Act:

Ford has advanced a number of arguments why the verdict against it on this claim is erroneous and should be set aside. However, it is necessary for us to consider only one which we find meritorious and dispositive of this claim.
497 F.2d at 589.

23. 525 F.2d at 1343.

24. *Id.* at 1346.

25. *Id.* at 1345 n.10.

84

factors enter into consumers' decisions to purchase automobiles. In addition, the court stated that vertical integration could adversely affect competition among dealers with regard to repair services.[26] In an oligopolistic industry such as automobile manufacturing, intrabrand competition among dealers of a single brand may be highly significant to the consumer.[27] Thus, restraints designed to achieve forward vertical integration may be found to be unreasonable. But in the absence of either a purpose to integrate vertically or such an operative effect, steps taken by a car manufacturer to enhance its market penetration against its manufacturing competitors can only enhance interbrand competition and must be deemed to be lawful. In addition, where the manufacturer's intent is not to maintain ownership of the dealer, but to sell its interest to the private manager, the eventual effect is an increase in the number of private dealers of that automobile brand and thus an enhancement of intrabrand competition. The rejection in *Coleman* of Chrysler's contention that it was entitled to a judgment n.o.v. rather than a new trial is no more than a holding that on the record in that case a jury could have found a purpose or operative effect of forward vertical integration by the elimination of independent dealers in the geographic and product market there considered.

■ This interpretation of *Coleman* is consistent with the Ninth Circuit's opinion in *England v. Chrysler Corp.,* 493 F.2d 269 (9th Cir. 1974). That case also involved a challenge to Chrysler's DE program based on § 1 of the Sherman Act. In affirming the district court's granting of a judgment notwithstanding the verdict in favor of the defendant, the Ninth Circuit stated that in order to prevail, the plaintiff must prove that the defendant's "conduct was deliber-

ate." 493 F.2d at 273. The court elaborated:

> To be deliberate does not mean there must be specific intent to produce the unreasonable economic effect (e. g., to "squeeze" Sunset). It means that there must be evidence from which it may at least be inferred that the conspirator determined upon the *course* of conduct, as opposed to the result.

> In this context, Chrysler's conduct would be deliberate if it could be inferred that Chrysler determined to manage Van Ness regardless of retail profit.

*Id.* (emphasis in the original). As this language suggests, intent or deliberateness can be proved by showing that the defendant has determined upon a course of conduct which in turn is likely to have anti-competitive effects.[28]

Having discussed what we consider to be the controlling precedent in this area, we turn now to an assessment of the circumstances of the present case. Although the first of the seven objects of the defendants' conspiracy listed in the charge referred to financing DE dealers "for the purpose of penetrating the automobile market in which DE dealers competed with the plaintiff to its loss", *see* p. 79 *supra,* the court's instruction did not require that the jury find that Chrysler had the purpose or its programs the actual effect either of concentrating sales of Dodge products in the hands of Chrysler-controlled dealerships or of limiting in any way the role of private venture capital dealerships in the distribution of Chrysler products. It is understandable that no such charge was given, for there is no evidence tending to support such a conclusion. The undisputed evidence is to the effect that each of the four DE dealer-

---

26. *Id.* at 1347.

27. *See* Note, *Vertical Integration as a Restraint on Intrabrand Competition: The Automobile Industry,* 17 B.C. Indus. & Com. L.Rev. 871, 875–79 (1976).

28. This interpretation of *Coleman* and *England* has recently been accepted by the district court in *Elfman Motors, Inc. v. Chrysler Corp.,* No. 72–1282 (E.D.Pa. August 9, 1977).

ships was intended by Chrysler to become a private capital dealership through the normal operation of the contracts with DE managers. Nor can it be inferred from the record in this case that Chrysler operated the DE dealers in disregard of retail profit. During the period when the Quinn program was in operation, Chrysler franchised Glauser Dodge as a new private venture capital dealer. Of the four DE dealerships complained of, one was terminated when it failed to achieve profitability, two had been converted to private ownership at the time of trial, and the fourth was subject to a contract providing for such conversion.[29] Finally there is no evidence from which the jury could have found that Glauser Dodge was a lost sales dealership which under the Quinn program was slated for replacement. The record requires the conclusion that the dealer support program outlined in Exhibits P-7 and P-8 was intended by Chrysler as a temporary and supplemental means of bolstering a defective private dealer network and not as a means for forward vertical integration into automobile distribution.[30] Thus, the potential for anti-competitive effects which we found to be significant in *Coleman* is absent here. Accordingly, *Coleman* does not compel a judgment for the plaintiff in this case.

■ Since *Coleman* does not control the outcome in this case, we must confront the more expansive theory advocated vigorously by Glauser Dodge. Under that theory, whenever a manufacturer subsidizes retail dealers in order to maximize its manufacturing profits by increasing its market penetration, there is an anti-competitive injury to any dealers who compete with the subsidized dealers. Glauser Dodge's counsel explained the full thrust of its theory when at oral argument on this appeal he explained:

> I think that a General Motors dealer could have complained about it. I think a Ford dealer could have complained about it. Anybody who had to compete in this market with the type of conduct that was involved here would have a complaint under the antitrust laws.[31]

It should also be noted that this theory is not consistent with the premise that the relevant product market should be restricted to Dodge dealers.

To the extent that Glauser Dodge claims an injury based solely on the loss subsidy theory, its claim is clearly foreclosed by our decision in *Rea v. Ford Motor Co.*, 497 F.2d 577, 590 (3d Cir.), *cert. denied*, 419 U.S. 868, 95 S.Ct. 126, 42 L.Ed.2d 106 (1974). However, to the extent that Glauser Dodge claims an injury other than loss subsidies, we are compelled to address the question left unanswered by this court in *Rea* —i. e., whether a manufacturer's subsidization of its partially or wholly owned dealerships for the purpose achieving market penetration violates § 1.

■ In this case, the evidence was that the subsidy took the form of capital investments, absorption of start-up expenses, and favorable credit arrangements. But plaintiff's theory of injury to competition would be equally applicable to any form of subsidy. Moreover, the effect on competition would be the same if the subsidies of which Glauser Dodge complains came from a source other than Chrysler.

---

29. As stated earlier, *see* p. 78 *supra,* the fourth DE dealer—Black Horse Dodge—was purchased by its manager in 1974, after the trial verdict in this case.

30. The only evidence that even remotely supports a *Coleman* violation is the hotly disputed evidence with regard to the deliveries for the 1969 opening. In light of the overwhelming evidence that the purpose and actual operation of the DE program was not to integrate vertically, this single, contradicted piece of evidence is simply not sufficient to support the jury's verdict.

31. Transcript of Oral Argument, *Glauser Dodge Co. v. Chrysler Corp.,* September 9, 1977, at p. 32.

For example, if, instead of Chrysler's investments, the four DE dealers had obtained more favorable lines of credit with banks and higher private venture capital investment, their ability to subject the plaintiff to intense price competition would be the same. Elimination of such competition cannot be the object of § 1 of the Sherman Act. *Cf. Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977). Yet all that distinguishes the instant case from that of the hypothetical better-financed private dealer is the source of the financing and the motive—market penetration—of the financing manufacturer. The fact that the source of the subsidy is the manufacturer itself, we conclude, does not under a rule of reason analysis of the facts bring this case within the reach of § 1 of the Sherman Act. The object of the antitrust laws is the enhancement of competition, while in essence Glauser Dodge argues that it is entitled to be insulated from competition encouraged by a manufacturer. Absent forward vertical integration whose purpose or actual operation is to concentrate Dodge sales in the hands of the Chrysler-owned dealers, the subsidies have a pro-competitive effect, at both the intrabrand and the interbrand levels. Accordingly, the motion for judgment notwithstanding the verdict should have been granted.

The judgment appealed from will be reversed.